# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| A.P.I., INC., ASBESTOS SETTLEMENT TRUST and A.P.I., INC., | Civil No. 09-975 (JRT/JJG) |
| Plaintiffs, | |
| v. | |
| HOME INSURANCE COMPANY; ZURICH AMERICAN INSURANCE COMPANY; ZURICH-AMERICAN INSURANCE COMPANY OF ILLINOIS; STEADFAST INSURANCE COMPANY; ZURICH INSURANCE COMPANY (Switzerland); AMERICAN GURANTEE AND LIABILITY INSURANCE COMPANY; AMERICAN ZURICH INSURANCE COMPANY; and ORANGE STONE REINSURANCE (Ireland), | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

John H. Faricy, Jr. and Vadim Trifel, **FARICY LAW FIRM, P.A.**, 333 South Seventh Street, Suite 2320, Minneapolis, MN 55402, for plaintiffs.

Peter G. Van Bergen, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416-5318, for defendant Home Insurance Company.

Peter G. Van Bergen and Andrea E. Reisbord, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416-5318; Richard Mancino, Russell D. Morris, Christopher J. St. Jeanos, and Jodi B. Leibowitz, **WILKIE FARR & GALLAGHER LLP**, 787 Seventh Avenue, New York, NY 10019,and Joseph G. Davis, , **WILKIE FARR & GALLAGHER LLP**, 1875 K Street N.W., Washington, DC 20006, for defendants Zurich American Insurance Company, Zurich-American Insurance Company of Illinois, and Steadfast Insurance Company.

Peter G. Van Bergen and Andrea E. Reisbord, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416-5318, for defendants Zurich Insurance Company (Switzerland), American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Orange Stone Reinsurance (Ireland).

This case is before the Court on defendants' motion for judgment on the pleadings. For the reasons set forth below, the Court grants in part and denies in part that motion.

## BACKGROUND

From the 1940s to the 1970s, plaintiff A.P.I., Inc. ("API") sold, distributed, and installed materials that contained asbestos. (Am. Compl. ¶ 2, Ex. 1, Docket No. 1.) In 1982, workers and other individuals who had suffered injuries from inhaling asbestos dust began asserting claims for asbestos-related injuries (the "asbestos-related claims"), and claimants have continued to bring actions against API since that time. (*Id.*) The asbestos-related claims typically allege "injury arising out of the operations of API." (*Id.* ¶ 20.) API obtained insurance coverage from several insurers, including St. Paul Fire and Marine Insurance Company ("St. Paul") and defendant Home Insurance Company ("Home"), to compensate individuals who brought asbestos-related claims against API. (*Id.* ¶ 3, 5.)

In June 2002, St. Paul brought an action in Minnesota state court seeking a declaration that it had no continuing obligation to provide coverage to API for asbestos-related claims. (*Id.* ¶ 8.) In response, API filed counterclaims against St. Paul and brought claims against other insurers, including Home, seeking a ruling that the policies

required the insurers to provide further coverage for asbestos-related claims. (*Id.*) Home filed a motion to dismiss on the basis that it was insolvent and in liquidation. (*Id.* ¶ 9.) The state court denied the motion to dismiss but stayed the proceedings as to Home. (*Id.*) API eventually settled with the other insurers (the "Settling Insurers"), but API and Home did not resolve the claims against Home. (*Id.* at ¶¶ 3, 7.)

As a result of the asbestos-related claims and "the failure of its insurers to provide insurance coverage afforded by their policies to cover" those claims, API filed for bankruptcy in January 2005. (*Id.* ¶ 4.) Under API's reorganization plan and pursuant to 11 U.S.C. § 524(g), the United States Bankruptcy Court created the A.P.I., Inc. Asbestos Settlement Trust (the "Trust"), which assumed API's rights and liabilities relating to the asbestos-related claims. (*Id.*) The Trust was responsible for paying asbestos-related claims and obtained the rights to pursue API's claims against insurers. (*Id.* ¶¶ 22-23.)

In March 2009, API and the Trust (collectively, "plaintiffs") filed an amended complaint in Minnesota state court "to resolve certain issues as to API's insurance coverage." (*Id.* ¶ 11.) Plaintiffs do not pursue claims that are stayed as to Home. (*Id.*) Instead, plaintiffs pursue claims against Zurich American Insurance Company, Zurich-American Insurance Company of Illinois, and Steadfast Insurance companies (collectively, "Zurich") directly and as successors-in-interest to Home. (*Id.* ¶¶ 15-17.) Plaintiffs allege that Zurich is liable for Home's conduct and for Home's obligations under the Home policies. (*Id.* ¶ 25.) Zurich timely removed the action to federal court. (Docket No. 1.)

# I. PLAINTIFFS' CLAIMS AGAINST HOME AND AGAINST ZURICH AS SUCCESSOR-IN-INTEREST

## A. Plaintiffs' Factual Allegations

Plaintiffs allege that there are three relevant categories of liability coverage under the Home policies: "products-completed work," "products/completed operations," and "operations." (*See* Am. Compl. ¶¶ 26-27, 32, Ex. 1, Docket No. 1.) On December 12, 2001, Home advised API that under the Home policies, "Home insurance has $174,569.00 remaining in primary limits" for payment relating to asbestos-related claims. (*Id.* ¶ 26.) Plaintiffs allege, however, that Home misallocated payments for many asbestos-related claims to the "products-completed work" and "products/completed operations" coverage categories. (*Id.* ¶ 27.) Plaintiffs also allege that Home misrepresented that once those coverage categories were exhausted, the Home policies would not cover any remaining asbestos-related claims. (*Id.* ¶ 28.) Plaintiffs allege that "bodily injury claims arising from hazards not defined within the 'products-completed work' and 'products/completed operations' portions of the policies are not subject to any policy or aggregate limit." (*Id.* ¶ 29.) Plaintiffs claim that the "operations" coverage in the Home policies is also not subject to an aggregate limit and that Home did not properly allocate payments for defense or indemnity of asbestos-related claims to that coverage category. (*Id.* ¶¶ 32-33.) In short, plaintiffs allege:

> By improperly allocating all indemnity payments on behalf of API to the "products-completed work" or "products/completed operations" coverages, Home attempted to improperly and prematurely exhaust that coverage thus exposing API to liabilities in the Asbestos-Related Claims even though many if not all of those claims were covered under the Home policies.

(*Id.* ¶ 37.)

With respect to Zurich's liability, plaintiffs "allege that Zurich is now responsible for the obligations of Home under the Home policies including responsibility for Home's improper handling of the Asbestos-Related Claims." (*Id.* ¶ 38.) Plaintiffs also bring independent claims against Zurich arising out of a series of agreements that Zurich entered into with Home. (*Id.*) Specifically, plaintiffs allege that Zurich and Home entered into agreements in which Zurich "obtained Home's assets and gained control over Home's activities." (*Id.* ¶ 39.) Among those agreements were a "Reinsurance Agreement" in which Zurich offered reinsurance certificates or replacement policies to Home in place of Home policies; a "Renewal Rights Agreement" providing that Home would cease writing renewal policies and would assist Zurich in assessing Home's book of business in order for Zurich to renew Home policies under Zurich's name; "Portfolio Swap Agreements," which enabled Zurich to gain control of Home's portfolio; and "Services Agreements" in which "Zurich 'obtained' Home's books and records . . . and opened dozens of new offices, established relationships and contacts with agents and brokers, and other infrastructure for both claims handling and underwriting aspects of Home's business. Zurich also 'obtained' 800 former Home employees and 'leased 1454 Home employees.'" (*Id.* ¶ 46.)

Plaintiffs allege that those agreements enabled Zurich to "assume[] daily management of Home's activities, [make] Home's claims and investment decisions and use[] Home's assets to pay for its own operations." (*Id.* ¶ 39.) Plaintiffs also allege that Zurich "withdrew or obtained billions in assets from Home and in return provided little or

no consideration," and that Zurich "was . . . aware of Home's obligations to pay coverage to API and other insured companies," but that Zurich did not compensate plaintiffs for Home's obligations. (*Id.* ¶ 42.) Finally, plaintiffs allege that "Zurich's control and mismanagement of Home eventually lead [sic] to Home's insolvency and Home's inability to provide coverage to API. Zurich intended to withdraw Home's assets for its own gain while leaving Home unable to satisfy its coverage obligations to its insured." (*Id.* ¶ 44.) Plaintiffs allege that as a result, API was forced to file for bankruptcy and that the Trust has been left with insufficient resources to continue to pay asbestos-related claims. (*Id.* ¶ 45.)

**B.    Plaintiffs' Claims**

The amended complaint alleges fourteen causes of action. Those claims fall into three general categories. First, Counts 1-5, 7, 10-11, and 13 are claims against Home regarding Home's conduct in response to API's asbestos-related claims (the "Home Claims"). Those Home Claims seek to hold Zurich vicariously liable for Home's conduct. Second, Counts 9, 12, and 14 seek declaratory judgments on Zurich's vicarious liability for the Home Claims (the "Vicarious Liability Claims"). Third, Counts 6 and 8 are direct claims against Zurich based on Zurich's agreements with Home and Zurich's alleged raiding of Home's assets (the "Zurich Claims").

As to the Home Claims, Counts 1 and 2 seek declaratory judgments that Home has a duty to defend, investigate and pay costs, and to pay claims for API's asbestos-related claims. (*Id.* ¶ 47-58.) Count 3 alleges breach of contract and asserts that Home

"breached its primary liability policies by applying defense and indemnity payment only to 'products-completed work' or 'products/completed operations' coverages and by failing to defend and pay" asbestos-related claims arising out of API's operations. (*Id.* ¶ 61.) Count 4 seeks contribution from Home for asbestos-related claims "[t]o the extent that one or more of the Settling Insurers paid more than its appropriate share under the policies issued to API." (*Id.* ¶ 66.) Count 5 seeks equitable reapportionment, or a "reallocation of defense and indemnity dollars" that Home improperly charged to and paid under the products-completed work or products/completed operations coverage provisions. (*Id.* ¶ 68.) Count 7 alleges bad faith or breach of fiduciary duty relating to Home's allocation of payments for API's asbestos-related claims and representation that API had nearly exhausted its coverage for those claims. (*Id.* ¶¶ 80-87.) Count 10 alleges that Home violated the Minnesota Consumer Protection Act, Minn. Stat. § 325F.69, by misrepresenting to API when it marketed and sold the Home policies that "any claims against API would be properly investigated, defended and indemnified by Home according to the terms of their respective policies." (*Id.* ¶ 102.) Count 11 alleges intentional or negligent misrepresentation based on Home's misrepresentation to API, based on aggregate limits for products-completed work or products/completed operations provisions of the Home policies, that the coverage for asbestos-related claims are or nearly are exhausted. (*Id.* ¶¶ 105-08.) Count 13 alleges that Home "acted unreasonably in breach of the implied covenant of good faith and fair dealing" by refusing to investigate and fully reimburse plaintiffs for costs relating to asbestos-related claims. (*Id.* ¶¶ 116-17.)

Plaintiffs do not pursue those claims against Home, as the Minnesota state court has stayed plaintiffs' claims against Home as pleaded in the original state court complaint. Plaintiffs allege, however, that "Zurich, as Home's principal, successor, 'alter ego,' or otherwise, is responsible for Home's obligations" or for damages arising out of those causes of action. (*See, e.g.*, ¶¶ 50, 61, 70.) In the Vicarious Liability Claims, plaintiffs seek to establish Zurich's liability for the Home Claims based on theories of "Alter Ego Responsibility," "*Respondeat Superior* Responsibility," and "On Account of Joint Venture." Count 9 seeks a declaratory judgment that Zurich is Home's "'alter ego' for purposes of satisfying Home's obligations to Plaintiffs with respect to Asbestos-Related Claims." (*Id.* ¶ 96.) Count 12 seeks a declaratory judgment that under the agreements between Home and Zurich, Zurich assumed control over Home, its operations, employees, and claims decisions, and that Zurich is therefore responsible under the theory of *respondeat superior* for Home's liabilities to plaintiffs under the Home policies. (*Id.* ¶¶ 111-12.) Count 14 alleges that Zurich and Home entered into a joint venture and that Zurich therefore must satisfy Home's contractual and other legal obligations to plaintiffs relating to the asbestos-related claims. (*Id.* ¶¶ 122-24, Prayer for Relief, ¶ 14.)

The Zurich Claims directly address Zurich's conduct regarding its agreements with and conduct toward Home. Count 6 alleges fraudulent transfer under Minn. Stat. §§ 513.44-45, claiming that "Zurich's control and insider relationship over Home . . . caused Home to make transfers of its assets to Zurich for little or no consideration," and that Home made those transfers "to escape liability to Plaintiffs." (*Id.* ¶¶ 76-77.) Count 8

alleges that Zurich tortiously interfered with API and Home's contractual relations by "engag[ing] in conduct with the intent to procure Home to breach its contract with API without justification." (*Id.* ¶¶ 88-93.)

## II.    DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

On July 17, 2009, Zurich filed a motion for judgment on the pleadings.[1]  Zurich argues that plaintiffs do not have standing to bring their claims because Home's liquidator has "exclusive standing" to bring those claims; that plaintiffs' Vicarious Liability Claims fail as a matter of law; that the applicable statutes of limitations bar plaintiffs' claims; and that plaintiffs' contribution and successor liability claims are not plausible.  Zurich filed twenty-seven exhibits in support of its motion.  Those exhibits include, *inter alia*, a set of "Recapitalization Agreements," a "Supervision Order," a "Rehabilitation Order," and a "Liquidation Order."  Zurich contends that those exhibits are part of the public record and that the Court may therefore consider them.

---

[1] On November 19, 2009, plaintiffs filed a second amended complaint.  The second amended complaint does not add or change substantive allegations from the first amended complaint, but adds as defendants Zurich Insurance Company (Switzerland), American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Orange Stone Reinsurance (Ireland).  (Second Am. Compl. at 1, ¶¶ 5, 18-21, Ex. 1, Docket No. 1.)  Plaintiffs allege that those additional defendants were parties to transactions involving Home and took insurance business from Home.  (*Id.* ¶¶ 18-21.)  On December 22, 2009, Zurich, including the new defendants, filed a motion to dismiss the second amended complaint for failure to state a claim.  Although the only change to the SAC was the addition of new defendants – which did not change the substantive allegations in any manner in the FAC, and which did not change the Court's standard of review – the parties submitted an additional seventy-seven pages of briefing.  The Court has taken under advisement Zurich's motion to dismiss the second amended complaint based on the briefing submitted by the parties, and an order on that motion is forthcoming.

Relying on the exhibits, Zurich describes its agreements with Home in the mid-1990s, the New Hampshire Insurance Department's ("NHID") supervision of Home's business, and the beginning of Home's liquidation. Zurich claims that in the mid-1990s, in a process that Zurich describes as "the Recapitalization" transaction, Home's parent corporation, Home Holdings, Inc. ("HHI"), entered into a series of agreements with Zurich in which HHI restructured its debt obligations and received $1.3 billion in reinsurance coverage, a $30 million line of credit, and claims- and policy-management services. (*See* Exs. 4-9, Docket Nos. 22, 24-25.) Because Home had decided to go into run-off and not to renew its policies, Zurich contracted to get access to Home's underwriting records to have the opportunity to compete for the business of Home's former policyholders. (*Id.*) The NHID conducted a three-month investigation of the transaction between Zurich and Home, gave notice to Home's policyholders and creditors of a public hearing on the investigation, and conducted a two-day public hearing reviewing the transaction. (Approval Order at 1-2, Ex. 1, Docket No. 22.)

On May 26, 1995, the NHID issued an order approving the transaction (the "Approval Order"). The Approval Order concluded that "[t]he transaction will enhance policyholder security in several ways, including providing 'quantifiable policyholder enhancements'' of at least $500 million. (*Id.* ¶ 7.) The Approval Order also concluded that the "plans or proposals to liquidate, sell the assets of, consolidate or merge the Insurers or to make any other material change in their respective businesses or corporate structures or management, are fair and reasonable to policyholders of [Home]." (*Id.* ¶ 10(d).) The Approval Order also directed Home to provide NHID with access to

Home's books and records and placed an NHID representative on Home's board.  (*Id.* ¶ 8.)  Pursuant to a Consent Order issued on June 9, 1995, the NHID assumed "oversight of the day-to-day business and operations of The Home."  (Consent Order at 1, Ex. 11, Docket No. 26.)

In March 1997, the New Hampshire Insurance Commissioner issued an Order of Supervision (the "Supervision Order"), stating that the "Commissioner shall oversee and supervise The Home for the purpose of continuing and intensifying an economic, actuarial and accounting review of the books, records and affairs of the Company so as to determine what future actions would be appropriate."  (Supervision Order ¶ 2, Ex. 12, Docket No. 26.)  The Supervision Order also set monetary limits on the transactions in which Home could engage and on transactions that Home could enter into with Zurich affiliates without approval from the NHID.  (*Id.* ¶ 4.)

On March 5, 2003, the New Hampshire Superior Court issued an Order of Rehabilitation (the "Rehabilitation Order") directing the "Rehabilitator," the New Hampshire Insurance Commissioner, to "secure all of the assets, property, books, records, accounts and other documents of The Home," and prohibiting any party from disposing of Home's assets without prior approval from the NHID.  (Rehabilitation Order at 1, Ex. 2, Docket No. 22.)  The Rehabilitation Order authorized the Rehabilitator, "in her discretion, to pay any and all claims for losses, in whole or in part, under policies and contracts of insurance and associated loss adjustment expenses."  (*Id.* at 3.)

On June 13, 2003, a New Hampshire Superior Court issued an Order of Liquidation (the "Liquidation Order") concluding that continued efforts to rehabilitate

Home would be futile, that Home was insolvent, and that Home should be liquidated. (Liquidation Order at 1-2, Ex. 3, Docket No. 22.)  The Liquidation Order vested the Liquidator – again, the New Hampshire Insurance Commissioner –"with title to all of the property, contracts and rights of action and all of the books and records of The Home, wherever located, and in whomever's possession they may be found."  (*Id.* at 2.)  The Liquidation Order directed the Liquidator to "secure all of the assets, property, books, records, accounts and other documents of The Home."  (*Id.*)  The Liquidation Order further provided:

> (m) All actions and all proceedings against The Home whether in this state or elsewhere shall be abated . . . , except to the extent the Liquidator sees fit and obtains leave to intervene;
>
> (n) To the full extent of the jurisdiction of the Court and the comity to which the orders of the Court are entitled, all persons are hereby permanently enjoined and restrained from any of the following actions:
>
>> (1) commencing or continuing any judicial, administrative, or other action or proceedings against The Home or the Liquidator;
>>
>> . . .
>>
>> (3) enforcing any judgment against The Home or its property;
>>
>> (4) any act to obtain possession of the property of The Home or to exercise control over property of The Home;
>>
>> . . .
>>
>> (6) any act to collect, assess, or recover a claim against The Home other than the filing of a proof of claims with the Liquidator;
>>
>> . . .
>
> (o) The Court hereby seeks and requests the aid and recognition of any Court or administrative body in any State or Territory of the United States

and any Federal Court or administrative body of the United States . . . or elsewhere to act in aid of and to be complementary to this Court in carrying out the terms of the [Liquidation] Order[.]

(Ex. 3 at 4-5, Docket No. 22.)

## DISCUSSION

## I.    STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is analyzed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). The Court therefore considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party. *Cf., e.g.*, *Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001) (per curiam). To survive a motion for judgment on the pleadings, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Cf. Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where

a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief," and therefore must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

"When considering a motion for judgment on the pleadings . . . the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (internal quotation marks and citation omitted).

## II.     PLAINTIFFS' STANDING

Under New Hampshire law, upon entry of an order of liquidation, "[t]he liquidator shall be vested by operation of law with the title to all of the property, contracts and rights of action and all of the books and records of the insurer ordered liquidated, wherever located, as of the date of the filing of the petition for liquidation." N.H. Rev. Stat. § 402-C:21(I). The liquidator may "[p]rosecute any action which may exist in behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer, or any other person." *Id.* § 402-C:25(XIII).

Zurich contends that plaintiffs do not have standing to pursue their claims because the Liquidation Order vests the Liquidator with "exclusive standing to prosecute claims on behalf of Home and its policyholders." (Defs.' Mem. in Supp. of Mot. for J. on the Pleadings at 13, Docket No. 21.) Zurich argues that Eighth Circuit law permits only the

Liquidator to bring a claim for fraudulent transfer as alleged in Count 6. Zurich argues that the Liquidator has exclusive standing to bring the remaining claims because those claims are common to all policyholders and creditors of Home and do not plead injuries that are unique to plaintiffs. Plaintiffs respond that because their claims are against Zurich – directly or based on theories of vicarious liability – and not Home, the Liquidator does not have "exclusive standing" to pursue the remaining claims.

As an initial matter, plaintiffs argue that the New Hampshire statute's language – which provides that the Liquidator "may," pursue claims on behalf of policyholder "subject to the court's control" – is permissive, and does not bar creditors and policyholders from bringing claims directly. The Court disagrees with plaintiffs' interpretation. The "may" language in the New Hampshire statute merely confers upon the Liquidator discretion to pursue those claims that the Liquidator deems appropriate. *Cf. In re Liquidation of Home Ins. Co.*, 953 A.2d 443, 453 (N.H. 2008) ("Had the legislature intended to vest the liquidator with the discretion to disallow setoffs, it would have chosen more permissive language, such as 'may' or 'might.' Accordingly, we decline to read [the statute] to authorize discretionary disallowance of otherwise qualifying setoffs." (citation and some internal quotation marks omitted)). The language does not address whether third parties may bring claims directly. Regardless of the statutory language, the Liquidation Order "permanently enjoin[s] and restrain[s]" "**all persons**" from "enforcing any judgment against The Home or its property" and from commencing "any act to collect, assess, or recover a claim against The Home other than

the filing of a proof claim with the Liquidator." (Liquidation Order at 4, Ex. 3, Docket No. 22 (emphasis added).)

Given that background, the Court thus turns to a consideration of the substantive claims in the amended complaint.

## A.     Fraudulent Transfer: Count 6

Count 6 alleges that plaintiffs are creditors of Home and that Home is a debtor. (Am. Compl. ¶ 72, Ex. 1, Docket No. 1.) Plaintiffs allege that Home did not satisfy its obligation to plaintiffs regarding the asbestos-related claims "because Home's property was fraudulently transferred to Zurich" for little or no consideration and with the purpose of hindering, delaying or defrauding plaintiffs. (*Id.* ¶¶ 74-76.) Plaintiffs allege that Home made the transfers to Zurich to escape liability to plaintiffs. (*Id.* ¶ 77.) Plaintiffs ask for an order *inter alia*, avoiding "the transfer or obligation to the extent necessary to satisfy Plaintiff's claim."[2] (*Id.*, Prayer for Relief ¶ 6.)

Defendants argue that based on the Eighth Circuit's holding in *Motlow v. Southern Holding & Securities Corp.*, 95 F.2d 721 (8th Cir. 1938), Home's Liquidator is vested

---

[2]  Plaintiffs' fraudulent transfer claims are based on Minnesota Statute §§ 513.44 and 513.45. (Am. Compl. ¶¶ 71-79, Ex. 1, Docket No. 1.) Section 513.44 provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation[.]" Minn. Stat. § 513.44(a); *see also id.* § 513.45(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").

with exclusive standing to bring fraudulent transfer claims. The Eighth Circuit held in *Motlow* that pursuant to New York laws relating to the liquidation of insurance companies, "[u]pon the entry of . . . an order [of liquidation,] the . . . liquidator[] becomes the statutory successor of the corporation and is vested by operation of law with title to all of its assets, including choses in action. He is given the right to avoid fraudulent transfers and to recover property wrongfully transferred." *Id.* at 724 (citation omitted); *cf. Neb. State Bank v. Jones*, 846 F.2d 477, 478 (8th Cir. 1988) (per curiam) (addressing a bankruptcy trustee's exclusive right to pursue fraudulent conveyance claims). "[T]o secure an economical, efficient, and orderly liquidation and distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, custody, and control of the assets be intrusted to a single management under the supervision of one court." *Motlow*, 95 F.2d at 725.

Plaintiffs argue that *Motlow* is distinguishable because in *Motlow*, the plaintiff "conceded" that the liquidator had exclusive standing to pursue a fraudulent transfer claim on the policyholders' behalf. This distinction is unavailing. Under New Hampshire law, upon the entry of an order of liquidation, the liquidator is vested with "title to **all** of the property, contracts and **rights of action** . . . of the insurer" on behalf of the insurer's creditors or policyholders. N.H. Rev. Stat. § 402-C:21(I) (emphasis added). (*See* Liquidation Order, Ex. 3 at 2, Docket No. 22.) The statutory language and the provisions of the Liquidation Order show that Home's Liquidator has the exclusive right

to bring a fraudulent transfer action on behalf of Home's creditors and policyholders.[3] *Cf. Corcoran v. Frank B. Hall & Co.*, 545 N.Y.S.2d 278, 280 (N.Y. App. Div. 1989) ("[T]he [Liquidator] had paramount and *exclusive* standing to assert claims not only on behalf of Union, but also on behalf of its policyholders and creditors." (construing New York insurance law)).

Plaintiffs also contend that the Minnesota Supreme Court's holding in *Fuhrman v. United America Insurors*, 269 N.W.2d 842 (Minn. 1978), "soundly rejects the jurisdiction of out-of-state receivers over Minnesota state courts." (Pls.' Mem. in Opp'n to Mot for J. on the Pleadings at 14, 18-23, Docket No. 38.) Plaintiffs' argument addresses a contention that Zurich does not make: that is, the parties agree that the Court is not, as a general matter, **required** to comply with the New Hampshire Superior Court's injunction in the Liquidation Order. *See id.* at 847. In these circumstances, however, the Court concludes that the interests of comity warrant dismissal of Count 6.

Minnesota has adopted the Insurers Rehabilitation and Liquidation Act ("IRLA") and is a "reciprocal state" under the IRLA.[4] *See generally* Minn. Stat. §§ 60B.01-.61.

---

[3] Plaintiffs assert that "a close reading of New Hampshire Statute 402-C:30(I) reveals that the statute limits the liquidator's powers to avoid fraudulent transfers to transfers occurring within a one year period prior to the filing of a successful petition for liquidation." (Pls.' Mem. in Opp'n to Mot. for J. on the Pleadings at 25-26, Docket No. 38.) Plaintiffs misconstrue the statute. The statute provides that any transfer made "without fair consideration, or with actual intent to hinder, delay or defraud either existing or future creditors" one year prior to the filing of a successful petition for rehabilitation or liquidation is fraudulent. N.H. Rev. Stat. § 402-C:30(I). The statute does not purport to limit the liquidator's ability to avoid fraudulent transfers that occur outside of that time period.

[4] At this stage of the litigation, the parties appear to agree – as they do in discussing claims pleaded in the amended complaint – that Minnesota law applies.

The IRLA provides for the recognition by one state of certain judgments of "reciprocal state" courts relating to the rehabilitation and liquidation of insurers. One of the purposes of the IRLA is to "lessen[] the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process, and by extension of the scope of personal jurisdiction over debtors of the insurer outside this state." *Id.* § 60B.01 subd. 4(e). Minnesota defines a reciprocal state as any state

> [i]n which in substance and effect sections 60B.21, subdivision 1; 60B.54, subdivisions 1 and 3; 60B.55; and 60B.57 to 60B.60; are in force, and in which provisions are in force requiring that the commissioner be the receiver of a delinquent insurer, and in which some provision exists for the avoidance of fraudulent conveyances and preferential transfers.

*Id.* § 60B.03 subd. 10.

New Hampshire is a reciprocal state under the IRLA. In addition to incorporating the sections referenced in the Minnesota statute, New Hampshire law requires its Insurance Commissioner to be the receiver of a delinquent insurer, N.H. Rev. Stat. § 402-C:21(I), and New Hampshire provides for the avoidance of fraudulent conveyances and preferential transfers, *id.* §§ 402-C:30-31.

The Liquidation Order "seeks and requests the aid and recognition of any Court . . . in any State . . . of the United States . . . and any Federal Court . . . of the United States to act in aid of and to be complementary to [the New Hampshire Superior Court] in carrying out the terms of the Order." (Liquidation Order at 5, Ex. 3, Docket No. 22.) Because the Court concludes that the Liquidation Order vests the Liquidator with exclusive authority to avoid fraudulent transfers by Home to Zurich, the Court declines

under the IRLA to exercise jurisdiction over plaintiffs' fraudulent transfer claim. In the interest of comity, the Court dismisses Count 6.

### B. Other Claims

Zurich contends that the Liquidation Order bars plaintiffs' remaining claims because those claims are "common to all [of Home's] creditors and policyholders, as opposed to an injury unique to Plaintiffs." (Defs.' Mem. in Supp. of Mot. for J. on the Pleadings at 14, Docket No. 21.) Zurich contends that plaintiffs claim an injury that "'is the same as all other [policyholders]: no monies available to pay their claims.'" (*Id.* (quoting *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, No. 3:99CV1254G, 2000 WL 36065, at *5 (N.D. Tex. Jan. 14, 2000)).)

Generally, a liquidator or receiver for an insurance company has standing to pursue claims that are common to all policyholders, as opposed to claims that are personal to a particular claimant. *See Ins. Comm'r of Mich. v. Arcilio*, 561 N.W.2d 412, 419 (Mich. Ct. App. 1997) ("[C]laims based on injuries common to all policyholders must be maintained by the rehabilitator in his representative capacity for their collective benefit."); *see also In re Bridge Info. Sys., Inc.*, 344 B.R. 587, 594 (E.D. Mo. 2006) (applying a similar principle in the context of a bankruptcy proceeding). Zurich argues that plaintiffs' claims do not allege injuries unique to them: "Regardless of their packaging, Plaintiffs' remaining claims rest on the theory that [Zurich] exercised control over Home and purportedly mismanaged Home's business and otherwise diminished the assets that Home otherwise might have had to pay policyholder claims." (Defs.' Mem. in

Supp. of Mot. for J. on the Pleadings at 14, Docket No. 21.)   According to Zurich, plaintiffs have not alleged that Zurich "engaged in any improper conduct directed uniquely at API. . . . Plaintiffs' claims against [Zurich] for **Home's** conduct rest entirely on theories of vicarious liability, which in turn rest entirely on allegations concerning [Zurich's] conduct toward **Home**, not toward API." (*Id.* at 15.)   Thus, Zurich argues that plaintiffs' claims "are common to all policyholders of Home, [and] Plaintiffs' claims can only be asserted by the Liquidator." (*Id.* at 15-16.)

Zurich's argument sweeps too broadly.   Plaintiffs allege three separate bases for vicarious liability – alter ego, *respondeat superior*, and joint venture – and the facts underlying those allegations are arguably "common" to all policyholders.   Not all of plaintiffs' claims and alleged injuries, however, are common to all policyholders.   The majority of plaintiffs' claims relate to Home's payment of claims and allocation of payments under Home policies for API's asbestos-related claims.   Plaintiffs' alleged injuries – including Home's misallocation of payments for asbestos-related claims to inapplicable coverage categories, and Home's alleged premature and improper exhaustion of coverage for asbestos-related claims – are unique to plaintiffs.   That is, there is no indication that Home's other policyholders have similar coverage-specific claims.

Zurich suggests that plaintiffs' claim that Zurich is vicariously liable for Home's conduct is an attempt to circumvent the stay on proceedings against Home.   *Fuhrman* offers useful guidance.   In that case, the plaintiff, Fuhrman, sought declaratory judgment from a Minnesota state court "to establish insurance coverage under a policy issued" by

United America Insurors ("United"). 269 N.W.2d at 844. An Iowa state court, however, had declared United insolvent and had placed United in receivership. *Id.* at 844-45. When Fuhrman brought his declaratory judgment action, "there was in effect an order from the [Iowa state court] enjoining all persons with claims against United from seeking adjudication of their claims in any court other than the Iowa court." *Id.* at 845. In concluding that Fuhrman could bring an *in personam* action against the receivership defendant outside of the receivership court, the Minnesota Supreme Court explained the role of receivership:

> When a corporation is placed in receivership, the court which grants the remedy and appoints the receiver also receives by operation of law constructive possession of the corporate assets. This corpus of property is the receivership res. It is well settled that once the res comes within the possession of the court, no action of any kind may be maintained which would interfere with this possession. . . .

*Id.* at 846.

Therefore, in evaluating whether the Liquidation Order vests with the Liquidator the sole authority to bring a particular claim, the Court considers in part whether plaintiffs' recovery for that claim may interfere with the possession of res under the Liquidator's control.

### 1. Tortious Interference with Contractual Relations: Count 8

Count 8 alleges that Zurich knew of the existing Home policies and knew of API's rights under those policies as they related to the asbestos-related claims. (Am. Compl. ¶ 90, Ex. 1, Docket No. 1.) Count 8 alleges that, despite this knowledge, "Zurich engaged in conduct with the intent to procure Home to breach its contract with API

without justification," and that "Zurich's acts resulted in Home breaching its contracts with API, prevented performance under the contracts, and resulted in Home's failure or inability to meet its contractual obligations to Plaintiffs." (*Id.* ¶¶ 91-92.)

Plaintiffs' allegations that Zurich tortiously interfered with API's and Home's insurance coverage contracts allege an injury common to all policyholders. Plaintiffs essentially claim that Zurich's raiding of Home's assets rendered Home unable to pay for the asbestos-related claims. Although plaintiffs connect Zurich's actions to the Home policies, the Court does not find a meaningful difference between plaintiffs' claims that Zurich has interfered with API's contractual rights by raiding Home's assets and other policyholders' similar claims for relief. (*See Brooklyn Union Gas Co. v. Century Indem. Co.*, No. 403087/2002, 2005 WL 6226508 (N.Y. Sup. Ct. Jan. 10, 2005) ("Here, although Brooklyn Union argues that it has 'personal contractual rights' which it seeks to enforce by suing Zurich, it is simply unclear that its rights differ from those of the other Home policyholders, all of whom were presumably injured by Zurich's alleged actions such that they cannot recover on their insurance policies. Brooklyn Union has not asserted a claim of personal injury and unique harm caused by Zurich." (citation omitted)), Ex. 2 at 2, Docket No. 23.) Further, plaintiffs seek to recover damages relating to Home's res, which the Liquidator has sole authority to protect and manage. Accordingly, and for the reasons of comity discussed further above, the Court dismisses the tortious interference claims in Count 8.

## 2. The Home Claims

The Home Claims – Counts 1-5, 7, 10-11, and 13 – are premised on Home's conduct relating to the payment, allocation of payments, and indemnification for API's asbestos-related claims. Those claims, and the injuries suffered, are not common to all of Home's policyholders. Moreover, because plaintiffs do not seek to recover from Home, if plaintiffs prevail on their claims, plaintiffs will be entitled to recover damages from Zurich. That recovery will not affect the res currently under the Liquidator's control in New Hampshire. Because the Liquidator does not have standing to bring these claims, the Court need not reach the question of whether comity supports dismissal.

Zurich cites two cases from New York trial courts, *Brooklyn Union Gas Co. v. Century Indemnity Co.*, No. 403087/2002, 2005 WL 6226508 (N.Y. Sup. Ct. Jan. 10, 2005), and *Consolidated Edison Co. of New York, Inc. v. American Home Assurance Co.*, No. 600527/01, slip op. at 3-4 (N.Y. Sup. Ct. Mar. 29, 2005), in support of its argument that the Court should dismiss the remaining claims.

Those cases are distinguishable. In *Brooklyn Union*, plaintiff Brooklyn Union sought a declaration from the trial court regarding Home's obligations under a liability policy issued to Brooklyn Union. (*Brooklyn Union*, 2005 WL 62265028, Ex. 2 at 2, Docket No. 23.) Similar to plaintiffs' position in the instant case, Brooklyn Union claimed that Zurich was Home's alter ego and that Zurich's conduct "led to the undercapitalization of Home and ultimately to its liquidation and apparent inability to make good on [the plaintiff's] insurance policy." (*Id.*) Zurich argued that Brooklyn Union's claims were common to all policyholders and that under the New Hampshire

Liquidation Order, the Liquidator had exclusive standing to pursue, on behalf of all policyholders, Brooklyn Union's claims. (*Id.* at 2-3.) In response, Brooklyn Union argued that its claim against Zurich was a "personal right to insurance coverage." (*Id.* at 3 (internal quotation marks omitted).) The court dismissed the claims for lack of standing and under the IRLA. (*Id.* at 3-4.) The court explained that "it is simply unclear that [Brooklyn Union's personal contractual] rights differ from those of the other Home policyholders, all of whom were presumably injured by Zurich's alleged actions such that they cannot recover on their insurance policies. Brooklyn Union has not asserted a claim of personal injury and unique harm caused by Zurich." (*Id.* at 3 (citation omitted).)

In *Consolidated Edison*, the court relied in large part on *Brooklyn Union* to dismiss plaintiff Consolidated Edison's claims against Zurich. Consolidated Edison sought a declaration from the court that, after the New Hampshire Superior Court had issued the Liquidation Order, Zurich, as Home's agent and alter ego, was legally responsible for Home's coverage obligations under Home's insurance policies with Consolidated Edison. (*Consol. Edison Co. of N.Y., Inc. v. Am. Home Assurance Co.*, No. 600527/01 (N.Y. Sup. Ct. Mar. 29, 2005), Ex. 4 at 2-3, Docket No. 23.) Consolidated Edison alleged that "Zurich controlled and dominated Home's insurance business causing a loss of the insurance coverage purchased by Con[solidated] Edison." (*Id.* at 3.) Zurich argued, as it did in *Brooklyn Union* and as it does here, that Consolidated Edison did not have standing to bring those claims because those claims were common to all Home policyholders and could only be maintained by the Liquidator. (*Id.*) The court agreed and followed *Brooklyn Union*, stating:

> In that case, [the court] . . . held that there was no standing on the part of the utility policyholder to pursue an action against Zurich, because the claim, if any, rested with the liquidator . . ., and that to permit an individual policyholder to go forward with such a claim would serve to subvert the stay contained in the [Liquidation Order].

*Id.* The court concluded that the *Consolidated Edison* case was similar to *Brooklyn Union* and thus dismissed Consolidated Edison's claims for lack of standing in light of the IRLA. (*Id.* at 3-4.)

By contrast, the Home Claims, unlike Count 8, do not relate directly to Zurich's alleged raiding of Home's assets. Moreover, by comparison to plaintiffs' tortious interference claim, those counts do not allege that Home was willing but unable, because of undercapitalization, to pay asbestos-related claims under the Home policies. Although the claims seek to hold Zurich vicariously liable based on Zurich's conduct vis-à-vis Home, the core of the claims is that (1) Home prematurely and improperly concluded that API had exhausted coverage for asbestos-related claims under the Home policies; and (2) Home refused to further defend or indemnify API for asbestos-related claims once coverage under the Home policies was purportedly exhausted. Those claims and API's injuries are unique to API, and other policyholders could not bring similar claims because the factual bases for API's claims are unique to API's circumstances. That is, the Home Claims plead more than simply "a personal right to insurance coverage."

In sum, the Court dismisses Count 6 for fraudulent transfer and Count 8 for tortious interference with contractual relations because the Liquidation Order vests with the Liquidator exclusive standing to bring those claims. The Court denies Zurich's

motion as to the remaining substantive claims because, as pleaded in the amended complaint, the Home Claims allege claims and injuries that are unique to plaintiffs.

## III.    VICARIOUS LIABILITY

In the Vicarious Liability Claims – Counts 9, 12, and 14 – plaintiffs seek declaratory judgments that Zurich is vicariously liable for Home's conduct as alleged in the Home Claims because Zurich is "Home's principal, successor, 'alter ego,' or otherwise."  Zurich argues that the Vicarious Liability Claims should be dismissed because plaintiffs have not adequately pled vicarious liability and because those claims, after the Liquidator assumed control of Home's operations on March 5, 2003, fail as a matter of law.

The Court first addresses Zurich's argument that plaintiffs have not adequately pled theories of vicarious liability.  The Court then turns to whether those theories fail as a matter of law in light of the Liquidation Order.

### A.    "Alter Ego" and *Respondeat Superior*

"[W]here the formalities of corporate existence are disregarded by one seeking to use [the corporate form], corporate existence cannot be allowed to shield the individual from liability for damages incurred by those dealing with the corporation."  *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979). The Court considers various case-specific factors to determine whether the corporation maintains a sufficiently separate corporate identity and the Court then evaluates whether there is "an element or injustice of fundamental unfairness."  *Id.*  (noting that the Court

may consider "insufficient capitalization for purposes of corporate undertaking, . . . insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, . . . and existence of corporation as merely facade for individual dealings").

Count 9 asserts that "Zurich is Home's 'alter ego' for purposes of satisfying Home's obligations to Plaintiffs with respect to Asbestos-Related Claims." (Am. Compl. ¶ 96, Ex. 1, Docket No. 1.) Count 9 alleges:

> Zurich controlled every aspect of Home's operations. Zurich managed Home's business activities, made Home's claims and investment decisions, used Home's assets to pay for its own operations, and used its own employees to control Home's activities. Furthermore, Zurich represented that Home's policyholders would have direct access to the substantial security and financial resources of Zurich.

(*Id.* ¶ 97.) Plaintiffs assert that "Zurich assumed such dominant control over Home, [that] Home became a mere façade for Zurich's self-dealings. It would be unjust and fundamentally unfair to not hold Zurich responsible for Home's obligations to Plaintiffs." (*Id.* ¶ 98.)

To determine whether the doctrine of *respondeat superior* applies, the Court must consider whether the alleged principal has the right to control the alleged agent. *See Urban ex rel. Urban v. Am. Legion Post 184*, 695 N.W.2d 153, 160 (Minn. Ct. App. 2005), *aff'd on other grounds*, 723 N.W.2d 1 (Minn. 2006). Plaintiffs allege that Zurich is responsible under the doctrine of *respondeat superior* "for Home's obligations and must satisfy Home's liabilities to Plaintiffs under the Home policies." (Am. Compl. ¶ 112, Ex. 1, Docket No. 1.) Count 12 alleges that pursuant to a series of agreements

between Home and Zurich, "Zurich assumed ownership and control over Home. Zurich directed Home's operations, employees and made Home's claims decisions." (*Id.* ¶ 111.)

Zurich argues that the Consent Order and Supervision Order establish that after Home and Zurich entered into the "Recapitalization" agreements, the NHID maintained active and daily oversight over Home's business. In particular, Zurich asserts that the Supervision Order "severely restricted transactions between Home and any party, including [Zurich], subjecting any transaction involving Home to NHID approval." (Defs.' Mem. in Supp. of Mot. for J. on the Pleadings at 25-26, Docket No. 21.) As a consequence, Zurich argues, plaintiffs' alter ego and *respondeat superior* claims fail as a matter of law.

Assuming that the Consent Order and Supervision Order are part of the public record and therefore that the Court may consider those orders, *cf. Elnashar v. U.S. Dep't of Justice*, 446 F.3d 792, 796 (8th Cir. 2006) ("[T]he district court may look to public records not contradictory to the complaint[] in a motion for judgment on the pleadings[.]"), the Court declines to accept Zurich's interpretation of the orders as effectively precluding plaintiffs' alter ego and *respondeat superior* claims. Notwithstanding the provisions of those orders, plaintiffs have pleaded plausible vicarious liability claims. Further, there are fact questions about whether the separate corporate existences of Zurich and Home were disregarded and about whether Zurich controlled or had the right to control Home after the New Hampshire court issued the Consent and Supervision Orders. Accordingly, dismissal is inappropriate at this stage of the litigation.

### B. Joint Venture

To establish a joint venture under Minnesota law, the Court considers the unique facts of the case. *Rehnberg v. Minn. Homes, Inc.*, 52 N.W.2d 454, 457 (Minn. 1952). At a minimum, the party seeking to establish a joint venture must plead and prove: (1) the existence of a contract, express or implied, showing that the parties entered into a joint venture; (2) that the parties combined "their money, property, time, or skill in some common undertaking"; (3) the existence of "a proprietary interest and right of mutual control over the subject matter of the property engaged therein"; and (4) the existence of an express or implied agreement that the parties share the profits of the venture. *Id.*

Count 14 alleges that Zurich is responsible for Home's obligations relating to the asbestos-related claims because Zurich and Home entered into a joint venture. (*Id.* ¶¶ 120-26.) Specifically, Count 14 alleges that Zurich and Home "entered into profit sharing agreements and combined money, property, time and employee labor in a common undertaking," and "shared an interest and mutual control over Home's insurance proceeds and other insurance and insurance related business." (*Id.* ¶¶ 123-24.)

Zurich argues that "[n]one of the Recapitalization Agreements cited by the Complaint contains any term evidencing a joint venture relationship." (Defs.' Mem. in Supp. of Mot. for J. on the Pleadings at 27, Docket No. 21.) Zurich cites a variety of "agreements" in support of its motion, including a 1995 Recapitalization Agreement, a 1995 Reinsurance Agreement, a 1995 Services Agreement, and a 1999 Portfolio Swap Agreement. (*Id.*) Zurich contends that those agreements do not evidence an agreement

to enter into a joint venture, and therefore, plaintiffs' joint venture claim must fail.  The Court disagrees.

As an initial matter, plaintiffs have adequately pleaded the existence of a joint venture.  Further, Zurich's attempt to match the agreements Zurich cites to agreements pleaded in the amended complaint is misplaced.  Plaintiffs did not plead an exhaustive list of agreements between Home and Zurich, (*see* Am. Compl. ¶ 46, Ex. 1, Docket No. 1), and Zurich's argument rests on the disputed assumption that the agreements that Zurich submitted to the Court with its motion are the agreements referenced in the amended complaint.  Those agreements "may or may not be the only . . . agreements relevant to [Home's] alleged [agreements] with [Zurich], and their significance is disputed."  *Cf. BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003).  The Court therefore declines to consider those agreements in the context of Zurich's motion for judgment on the pleadings.  Further, even if the Court were to consider the agreements, there is no indication that the agreements submitted are the agreements pleaded in the amended complaint or that those agreements constituted all of the agreements between Home and Zurich.  *Cf. id.* ("Here, however, BJC alleged the existence of a contract, not a specific document, and the documents provided by Columbia were neither undisputed nor the sole basis for BJC's complaint.").

Plaintiffs have adequately pleaded the existence of a joint venture.  Although Zurich's arguments and submissions may be relevant to a motion for summary judgment, they are premature at this stage of the litigation.

## C.    Vicarious Liability Claims After March 5, 2003

Zurich also argues that to the extent plaintiffs assert claims that Zurich was vicariously liable for claims arising after March 5, 2003, those claims must be dismissed. On March 5, 2003, the New Hampshire Superior Court appointed the New Hampshire Insurance Commissioner as "Rehabilitator."  (Rehabilitation Order at 1, Ex. 2, Docket No. 22.)  Pursuant to the Rehabilitation Order, the Rehabilitator had the "powers of the officers and managers of . . . Home," and was authorized "to pay any and all claims for losses, in whole or in part, under policies and contracts of insurance."  (*Id.* at 2-3.) Zurich argues that "[o]nce the NHID assumed complete control over the affairs of Home, the potential for imposition of vicarious liability – or any form of liability based on Home's conduct – upon [Zurich] ceased."  (Defs.' Mem. in Supp. of Mot. for J. on the Pleadings at 16-17, Docket No. 21.)

The Court concludes that the effect of the Rehabilitation Order on Zurich's relationship with Home is a question of fact.  Although the Rehabilitation Order's provisions strongly suggest that Zurich could not be vicariously liable for Home's actions after March 5, 2003, the Order does not render implausible plaintiffs' allegations of alter ego, *respondeat superior*, or joint venture liability.  Dismissal of those claims is not appropriate at this early stage of the litigation.


## IV.    STATUTE OF LIMITATIONS

Zurich also argues that applicable statutes of limitations bar plaintiffs' claims. Because the Court dismisses the fraudulent transfer claim and the tortious interference

claims for lack of standing, the Court does not address the parties' arguments regarding whether those claims are barred. The remaining claims, the Home Claims, have six-year statutes of limitations. *See* Minn. Stat. § 541.05 subd. 1(1) (contract claims); *id.* § 541.05 subd.1(6) (fraud claims); *id.* § 541.05 subd. 1(2) (statutory claims). Zurich was served with the amended complaint on March 25, 2009, and, therefore, any claim accruing prior to March 25, 2003, would ordinarily be time-barred.

On August 20, 2002, API filed a complaint against Home in Minnesota state court alleging claims that are similar, if not identical, to the claims plaintiffs now plead against Zurich as Home's successor-in-interest. (Ex. 13, Docket No. 26; Am. Compl., Ex. 1, Docket No. 1.) Zurich argues that plaintiffs knew of their claims in August 2002, more than six years before plaintiffs filed their amended complaint adding Zurich as a successor-in-interest. As a consequence, Zurich argues, those claims are time-barred. Zurich separately argues that Count 10, which alleges violations of the Minnesota Consumer Protection Act, is time-barred because a statutory consumer fraud claim "accrue[s] at the time the alleged statutory violation occurred." *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 957 (D. Minn. 2000). Count 10 alleges that Home misrepresented the scope of coverage under the Home policies "in its marketing and sale of the respective policies to API." (Am. Compl. ¶ 102, Ex. 1, Docket No. 1.) Plaintiffs also allege that Home sold the Home policies to API between 1970 and 1976. (*Id.* ¶ 25.) Thus, Zurich argues that plaintiffs have conceded that Count 10 is time-barred.

Plaintiffs respond that the amended complaint "relates back" to the date of the original state complaint against Home and argue that the vicarious liability claims against

Zurich are therefore not time-barred.  Federal Rule of Civil Procedure 15(c) provides that

an amended pleading may "relate back" to the date of the original pleading when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, **but for a mistake concerning the proper party's identity**.

Fed. R. Civ. P. 15(c)(1) (emphasis added).

To the extent that Rule 15(c)(1)(A) applies, Minnesota Rule of Civil Procedure

15.03 provides that an amended pleading relates back to the date of the original pleading

"[w]henever the claim or defense asserted in the amended pleading arose out of the

conduct, transaction, or occurrence set forth or attempted to be set forth in the original

pleading."  Minn. R. Civ. P. 15.03.  If the amended pleading changes the party against

whom a claim is asserted, the amended pleading relates back if the foregoing requirement

is met and the party brought in, within the statutory period for commencing the action,

"(1) has received such notice of the institution of the action that the party will not be

prejudiced in maintaining a defense on the merits, and (2) knew or should have known

that, **but for a mistake concerning the identity of the proper party, the action would have been brought against that party**.” *Id.* (emphasis added).

Plaintiffs argue that they have adequately pleaded that Zurich received constructive notice of the original complaint against Home by virtue of Zurich's shared "identity of interest," and, as a consequence, plaintiffs contend that Zurich will not be prejudiced in defending against these claims. *See Carlson v. Hennepin County*, 479 N.W.2d 50, 54 (Minn. 1992) (recognizing that, under Minnesota law, for the purposes of constructive knowledge of a complaint, "two entities have an identity of interest when they share such an intimacy in their business operations and organization that service on one imputes notice to the other" (internal quotation marks omitted)).[5]

Zurich responds that evidence in the public record demonstrates that there was no mistake regarding Zurich's identity at the time API filed the complaint against Home in August 2002. Zurich asserts: "Plaintiffs counsel[, in its trial brief,] told the state court that it knew about 'Zurich Insurance Company' and its potential liability in 2003. Indeed, Plaintiffs said they were considering claims against 'Zurich' and were aware of statute of limitations issues." (Defs.' Reply in Supp. of Mot. for J. on the Pleadings at 9, Docket No. 4 (citations omitted).) Zurich's argument, however, omits the fact that API made the first statement in its trial brief – a memorandum in opposition to Home's motion to dismiss – on **September 23, 2003**, and that API made the second

---

[5] The parties do not dispute that the claims in the amended complaint arose out of the same "conduct, transaction, or occurrence" set out in the original state complaint. *See* Fed. R. Civ. P. 15(c)(1)(B).

representation to the trial court at a hearing on **October 2, 2003**. Both dates are over a year after API filed the original complaint against Home and, incidentally, are approximately six months after March 25, 2003 (six years before plaintiffs filed the amended complaint). Consequently, at this stage of the litigation, Zurich's submissions are of little probative value in determining whether plaintiffs were mistaken as to the proper party to the action at the time API filed the original complaint.

The Court concludes, based on the facts alleged in the amended complaint about Zurich's relationship to Home, that dismissal on statute of limitations grounds is not warranted at this time. To the extent that Zurich argues that plaintiffs have the burden of establishing relation back, the Court agrees. *See In re Prof'l. Fin. Mgmt., Ltd.*, 703 F. Supp. 1388, 1392 (D. Minn. 1989). The case Zurich cites, however, applies that burden in the context of a motion for summary judgment, when the parties are prepared to adduce evidence in support of their positions. In these circumstances, the Court declines to require plaintiffs to satisfy that burden in response to Zurich's motion for judgment on the pleadings.[6] Further, with the exception of Count 10, there is a fact question about when plaintiffs' claims accrued.

---

[6] Plaintiffs argue that Zurich is judicially estopped from asserting the statute of limitations argument because that argument is inconsistent with a position that Zurich argued and prevailed upon in a previous litigation in 2001. The Court does not address the judicial estoppel argument because it concludes, regardless, that dismissal is inappropriate under the relation-back principle. As to Count 10, plaintiffs' judicial estoppel argument is not persuasive. As discussed below, the statute of limitations for the consumer fraud act claim would have commenced at the latest in 1976, over two decades before Zurich allegedly took the inconsistent position in the previous litigation.

Count 10, however, must be dismissed. The Minnesota Consumer Protection Act provides that "[t]he act, use, or employment by any person of any fraud, false pretense, . . . misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable[.]" Minn. Stat. § 325F.69, subd. 1. Plaintiffs allege in Count 10 that "Home, in its marketing and sale of its respective policies to API, misrepresented to API that any claims against API would be properly investigated, defended and indemnified by Home according to the terms of the respective policies." (Am. Compl. ¶ 102, Ex. 1, Docket No. 1.) "[Minnesota] statutory fraud claims accrue at the time the alleged statutory violation occurred." *Parkhill*, 174 F. Supp. 2d at 957. Plaintiffs allege that Home made misrepresentations to API when it marketed and sold the Home policies to API, those events took place between 1970 and 1976. Plaintiffs consumer-fraud claim against Zurich, even if it relates back to August 2002, is decades late. Accordingly, Count 10 is time-barred.

## V.     ZURICH'S SUCCESSOR LIABILITY

Under Minnesota law,

[W]here one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

*Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn. 1989) (internal quotation marks omitted; alteration in original).

Zurich argues that plaintiffs have not adequately pleaded a basis for successor liability, in large part because API makes only a "conclusory" allegation that Zurich is Home's successor. Further, Zurich contends that API does not allege that all or even substantially all of Home's assets were transferred to Zurich. Finally, Zurich argues that plaintiffs' allegations are not plausible under *Iqbal* because a variety of provisions from the Recapitalization Agreements demonstrate that Home retained its assets in the agreements with Zurich. The Court disagrees and concludes that plaintiffs have adequately pleaded successor liability.

API alleges that "Zurich obtained Home's assets and gained control over Home's business" by entering "into a series of agreements with Home." (Am. Compl. ¶ 39, Ex. 1, Docket No. 1.) That allegation is supported by additional factual allegations, (*see id.* ¶¶ 38-46), and the Court finds that those allegations are plausible and not conclusory. Further, as discussed above regarding the vicarious liability claims, the Court is not persuaded that Zurich's citation to the Recapitalization Agreements is dispositive to the Court's review under Rule 12(c). The proper interpretation of those agreements is undetermined and the parties have not completed discovery of the full scope of alleged agreements. The Court therefore declines to consider the substance of Zurich's Recapitalization Agreement. In sum, plaintiffs have pleaded a plausible claim for successor liability.

## VI.    COUNT 4: CONTRIBUTION

Count 4 alleges that, pursuant to settlement agreements with plaintiffs, the settling insurers have assigned their rights and claims regarding other insurers to plaintiffs. (Am. Compl. ¶ 65, Ex. 1, Docket No. 1.) Plaintiffs allege that "[t]o the extent that one or more of the Settling Insurers paid more than its appropriate share under the policies issued to API, Plaintiffs are entitled to contribution from Zurich, as Home's principal, successor, 'alter ego,' or otherwise, for those payments." (*Id.* ¶ 66.) Zurich argues that plaintiffs' contribution claim as pleaded in Count 4 must be dismissed.

The equitable doctrine of contribution "requires that persons under a common burden share that burden equitably." *Nuessmeier Elec., Inc. v. Weiss Mfg. Co.*, 632 N.W.2d 248, 251 (Minn. Ct. App. 2001) (internal quotation marks omitted). "The essential elements of a contribution claim are (1) common liability of two or more actors to the injured party; and (2) the payment by one of the actors of more than its fair share of that common liability." *Id.* Zurich argues that plaintiffs have not adequately pleaded that Zurich and the Settling Insurers share a common liability to plaintiffs because the claims plaintiffs assert belong to the Liquidator. Zurich also contends that the phrase "to the extent," as pleaded in the amended complaint, is too conditional to adequately plead a claim for contribution. Zurich also argues that the doctrine of laches bars plaintiffs' contribution claim because plaintiffs are essentially attempting to avoid the statute of limitations by taking assignments of the Settling Insurers' rights and claims.

As discussed above, the Liquidator does not have exclusive standing to pursue the Home Claims, which plead injuries that are unique to plaintiffs. Thus, plaintiffs have

established a common liability among the Settling Insurers and Zurich as successor to Home. Further, plaintiffs' use of the term "to the extent" in the amended complaint does not render the allegation implausible. Of course, plaintiffs must eventually adduce evidence that the Settling Insurers paid more than their appropriate share, but that consideration must wait for summary judgment or a trial on the merits. Finally, the Court declines to apply the doctrine of laches at this stage of the litigation, as there remains a dispute of fact whether the statute of limitations in fact bars plaintiffs' claims. The Court thus denies Zurich's motion for judgment on the pleadings on Count 4.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion for Judgment on the Pleadings [Docket No. 19] is **GRANTED in part** and **DENIED in part** as follows:

1.     The motion is **GRANTED** as to Counts 6 (fraudulent transfer), 8 (tortious interference with contractual relations), and 10 (violations of the Minnesota Consumer Protection Act). Accordingly, those claims are **DISMISSED**.

2.     The motion is **DENIED** in all other respects.

DATED:  March 31, 2010          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                        United States District Judge