# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| A.P.I., INC., ASBESTOS SETTLEMENT TRUST and A.P.I., INC., | Civil No. 09-975 (JRT/TNL) |

Plaintiffs,

v.

HOME INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, ZURICH-AMERICAN INSURANCE COMPANY OF ILLINOIS, STEADFAST INSURANCE COMPANY, ZURICH INSURANCE COMPANY (Switzerland), AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, AMERICAN ZURICH INSURANCE COMPANY, and ORANGE STONE REINSURANCE (Ireland),

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Defendants.



John H. Faricy, Jr., **FARICY LAW FIRM, P.A.**, 12 South Sixth Street, Suite 211, Minneapolis, MN 55402; and Vadim Trifel, **FARICY LAW FIRM, P.A.**, 333 South Seventh Street, Suite 2320, Minneapolis, MN 55402, for plaintiffs.

Peter G. Van Bergen and Andrea E. Reisbord, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416-5318; Richard Mancino and Christopher J. St. Jeanos, **WILKIE FARR & GALLAGHER LLP**, 787 Seventh Avenue, New York, NY 10019; and Joseph G. Davis, **WILKIE FARR & GALLAGHER LLP**, 1875 K Street N.W., Washington, D.C. 20006, for defendant Home Insurance Company.

FILED 3/30/2012
RICHARD D. SLETTEN

JUDGMENT ENTD _____
DEPUTY CLERK  TS

Doc. No. 360

Peter G. Van Bergen, Kimberly Fleming, and Andrea E. Reisbord, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416-5318; Richard Mancino, Gregory E. Reid, and Christopher J. St. Jeanos, **WILKIE FARR & GALLAGHER LLP**, 787 Seventh Avenue, New York, NY 10019; and Joseph G. Davis, Johanna M. Hickman and Michael P. Trahar, **WILKIE FARR & GALLAGHER LLP**, 1875 K Street N.W., Washington, DC 20006, for defendants Zurich American Insurance Company, Zurich-American Insurance Company of Illinois, Steadfast Insurance Company, Zurich Insurance Company (Switzerland), American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Orange Stone Reinsurance (Ireland).

Plaintiffs A.P.I., Inc. Asbestos Settlement Trust and A.P.I., Inc. (collectively "API") seek to recover from defendants other than Home (collectively "Zurich") on vicarious and successor liability theories. API now moves for summary judgment on its *respondeat superior* theory only. Zurich moves for summary judgment on all of API's claims. Because the Court finds that API's vicarious and successor liability theories fail as a matter of law, the Court will deny API's motion for partial summary judgment and grant Zurich's motion.

## BACKGROUND

This action is rooted in a June 2002 state court action by one of API's primary insurers seeking declaratory relief. (Am. Compl. ¶ 8, Mar. 25, 2009, Docket No. 1.) API counterclaimed against the other insurers, including Home Insurance Company ("Home"), seeking a ruling that the policies required the insurers to provide further coverage. (*Id.*) The state court stayed the proceedings as to Home, which by then was insolvent and in liquidation. (*Id.* ¶ 9.) API is not pursuing the stayed claims against

Home, but proceeding only against Zurich.  (*Id.*)[1]  Following the Court's March 2010

Order, API's remaining claims are rooted in theories of vicarious and successor liability.

See *API, Inc. et al. v. Home Ins. Co., et al.*, 706 F. Supp. 2d 926, 947 (D. Minn. 2010)

(dismissing direct claims against Zurich).

From the 1940s to the 1970s, A.P.I., Inc. sold, distributed, and installed materials

that contained asbestos.  (Am. Compl. ¶ 2.)  Workers and other individuals suffering

injuries from inhaling asbestos dust began asserting claims for asbestos-related injuries

against API in 1986.  (Docket No. 305-12.)[2]  API obtained insurance coverage for

asbestos-related claims from several insurers, including Home, between 1970 and 1976.

(Docket No. 306-5, at 4-6.)   Home and API's other primary carriers shared the

responsibility of covering the asbestos claims; the carriers memorialized this agreement

in a Claims Handling and Settlement Agreement ("CHSA") in 1993.  (Docket No. 305-2;

Docket No. 307-1 (Huffer) (138:6-139:8).)  Approximately 2,300 claims (the "Closed

Claims") were resolved under the CHSA through 2002 for which API paid little or

nothing in defense or indemnity.   (Docket No. 307-6 (Rachey) (66:8-22); Docket

No. 321-2 (O'Malley) (67:19-68:20).)

---

[1] API filed a Second Amended Complaint, identical to the first but for adding defendants Zurich Insurance Company, American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Orange Stone Reinsurance. (Nov. 11, 2009, Docket No. 74.)

[2] This opinion refers to record documents appended to affidavits of counsel, including deposition transcripts, in the following form: Docket Number-Exhibit Number (Deponent) (transcript lines).  The exhibit number refers to the exhibit number as appended to that docket entry, not to the numbering system of the underlying affidavit.

According to API, "[d]ue to the denial of coverage by Home and other carriers, and the financial uncertainty resulting from the lack of available coverage, including pressure from API's bankers and bondholders, API . . . fil[e]d for bankruptcy" in January 2005. (Aff. of Loren Rachey, July 29, 2011, Docket No. 323; Docket No. 306-10, at 4.) Under API Inc.'s reorganization plan and pursuant to 11 U.S.C. § 524(g), the United States Bankruptcy Court created the A.P.I., Inc. Asbestos Settlement Trust (the "Trust"), which assumed API Inc.'s rights and liabilities relating to the asbestos-related claims. (Am. Compl. ¶ 4.)  Following API Inc.'s bankruptcy, the Trust was responsible for paying asbestos-related claims and obtained the rights to pursue API Inc.'s claims against insurers.  (*Id.* ¶¶ 22–23; Docket No. 306-4.)  Trustee Robert Brownson since approved payments on 692 claims that were pending at the time of the bankruptcy.  (Docket No. 306-2, at 4, Ex. 2.)  At least 370 additional claims have been filed since the Trust began operations in February 2007.  (Docket No. 307-8 (Brownson) (84:20-85:11; 106: 15-107:8).)  The claims Brownson approved and the additional claims of those 370 that have been paid pursuant to the Trust Distribution Procedures ("TDP") comprise the "Trust Claims."

## I.     THE 1995 RECAPITALIZATION AND HOME'S OPERATION IN ITS WAKE

At the epicenter of the parties' dispute is what Zurich describes as the recapitalization transaction (the "Recapitalization"), a restructuring and refinancing of Home involving approval and oversight of insurance regulators from seven states. Immediately prior to the Recapitalization, Home was a commercial property and casualty

insurer domiciled in New Hampshire in dire financial straits. (Gluckstern Aff. ¶¶ 12-13, June 27, 2011, Docket No. 294.)   Swedish insurance company Trygg-Hansa AB ("Trygg") – through Home Holdings Inc. ("HHI") – invested hundreds of millions to revive Home, but was unsuccessful. (Docket No. 304-11, at 1; Docket No. 303-6, at 27; Docket No. 304-11, at 4-5; Docket No. 308-3, ¶ 16.)   Following a downgrade of its claims payment rating, Home was effectively disqualified from insuring many commercial and government accounts. (Docket No. 307-11 (Faigin) (106:6-25, 108:7-14); Docket No. 307-13 (Kramer) (70:1-72:17).)   Home's revenues fell, and many of its customers and employees left.   (Docket No. 307-14 (Marziano) (81:9-87:4); Docket No. 308-7, at 11-12.)

Amid Home's downward spiral, Home's parent corporation HHI, Zurich Centre Investments Limited ("ZCIL"), and several other entities committed to an Agreement in Principle whereby the parties manifested their intent to enter into various transactions to recapitalize Home and restructure its debts. (Gluckstern Aff. ¶¶ 15-19, Ex. B.)   Because this Recapitalization would result in ZCIL and other Zurich companies owning more than 10% of HHI's common stock, the transaction required regulatory approval. (*Id.* ¶ 17; *see also* N.H. Rev. Stat. § 401-B:2(II).)   The New Hampshire Insurance Department ("NHID"), coordinating the efforts of regulators from six other states, conducted a three-month investigation of the transaction, gave notice to Home's policyholders and creditors

of a public hearing on the investigation, and conducted a two-day public hearing reviewing the transaction.[3]  (Docket No. 294-14 ("Approval Order") at 1, 5, 8-10.)

## A.     Regulatory Approval and Supervision

Specifically, the Recapitalization was subject to the approval of state insurance departments through the so-called "Form A" process, designed to ensure that proposed transactions are fair and reasonable to policyholders.  (Docket No. 297-8, at 1-2; Docket No. 308-3, ¶ 14; *see also* N.H. Rev. Stat. Ann § 401-B:2(II), (V).)  The NHID, as New Hampshire-based Home's principal regulator, partnered with six other insurance departments to review the Recapitalization.  (Gluckstern Aff. ¶¶ 18-23; Docket No. 308-3, at 9-10.)  The regulators' primary concern was to protect the interests of Home's policyholders.  (Docket No. 306-12 (Solitro) (153:23-154:6, 493:19-494:1; 41:9-24; 62:8-12).)

---

[3] Laurence Cheng, an officer and director of various Zurich entities starting in at least the early 1990s, also served as a director of HHI prior to the Recapitalization.  (Docket No. 324-38 (Cheng) (59:15-61:19).)  In the run-up to Zurich's submission of the Form A application, Cheng wrote to William Bolinder, a board member of ZIC, about Home's investment portfolio.  Specifically, Cheng stated that the investment portfolio had a market value of approximately $3.6 billion and a "duration of around 3.5 years." (*Id.* at 117:19-121:4; Docket No. 324-2.)  This information was published in Home's regulatory filings.  (Docket No. 334-10, at 49-50 ("duration of the fixed maturity portfolio was 3.5"); Docket No. 334-11, at 35-37; Docket No. 334-12, at 12; Docket No. 334-13, at Sch. D; Docket 324-38 (Cheng) (119:15-121:4).)

In view of Zurich's promise of a 7.35% rate of return for Home, assuming construction of a portfolio yielding an 8.6% return, Cheng forecasted a present value profit of $157.5 million.  (Docket No. 324-2.)  Although Cheng recused himself from consideration of the Agreement in Principle that formed the basis of the Recapitalization, (Docket 324- 38 (Cheng) (167:16-169:7); Docket No. 332-1), the Recapitalization Agreement bears Cheng's signature under the Zurich signature line.  (Docket No. 22-4, at 116-17.)  The Note Exchange Agreement, another of the agreements executed in connection with the Recapitalization, bears Cheng's signature under the HHI signature line.  (Docket 324-8.)

NHID held two days of public hearings in early April 1995; witnesses from Home, Zurich, Trygg, and experts retained by NHID testified under oath and were cross-examined. (Approval Order at 1-2; *see generally* Docket Nos. 300-3, 4, 5 (hr'g trs.).) More than fifty policyholders and other parties intervened. (Approval Order at 1-2.) Intervenors were allowed to conduct pre-hearing discovery, examine and cross-examine witnesses, offer evidence, and present oral and written arguments. (Docket No. 300-3 (6:17-7:3, 11:23-12:9); Docket No. 299-7.) Peter Johnson, CEO and Chairman of both Risk Enterprise Management ("REM") – a non-party entity crucial to the dispute, discussed below – and Home from 1995 to 2003, testified that "Zurich wanted to be the majority owner of the company that managed [Home]. . . ." (Docket No. 324-K (Johnson) (202:5-24).) Zurich "committed to insure that REM ha[d] adequate resources to me[et] its obligations" and that REM would "be able to access the Zurich actuarial, legal, insurance professionals." (*Id.* at 102:23-103:8.) The Commissioner left the record open until May 16, 1995 to allow for more comments after the hearing. (Docket No. 306-12 (Solitro) (200:4-25).)

Regulators negotiated with ZCIL and the other entities for months and extracted a number of enhancements for Home's policyholders. (Gluckstern Aff. ¶¶ 18-23; *see also* Docket No. 294-8; Docket No. 303-7; Docket No. 303-9.) These enhancements included:

i.  An approximately $1.3 - $1.6 billion reinsurance contract to replace the $590 million policy Home had with various reinsurers for no additional premium. (Approval Order at 4; Docket No. 296-4 (new agreement); Docket No. 303-3 (hr'g tr.) (25:16-26:21); Gluckstern Aff. ¶ 21.)

ii. A "portfolio value swap agreement" whereby Centre Reinsurance International agreed to provide Home a guaranteed 7.5% annual rate of return

on its $3 billion investment portfolio. (Approval Order at 4.) This agreement was designed to mollify regulators' concern about uncertainty in Home's investment returns. (Docket No. 306-12 (Solitro) (105:13-107:14, 146:13-147:16).)

iii.  A "services agreement" with REM whereby REM contracted to manage Home's claims. (Approval Order at 5.) REM would be reimbursed for its costs, and its profits would be limited to 15%, deferred, and subject to regulatory approval. (Gluckstern Aff. ¶ 21.) This arrangement was designed to provide quality service to policyholders while minimizing the cost to Home of managing its business. (Approval Order at 5.)

The Recapitalization also included a "renewal rights agreement" whereby Zurich affiliates obtained access to Home's books and records in order to compete for the business of Home's policyholders and potentially to hire former Home personnel. (Docket No. 296-3 (Renewal Rights Agreement); Docket No. 308-7 at 15; Docket No. 307-13 (Kramer) (93:24-94:53).)

On May 26, 1995, the NHID issued an order approving the Recapitalization (the "Approval Order"). The Approval Order concluded that "[t]he transaction will enhance policyholder security in several ways, including providing 'quantifiable policyholder enhancements'" of at least $500 million. (Approval Order ¶ 7.) The Approval Order also concluded that the "plans or proposals to liquidate, sell the assets of, consolidate or merge the Insurers or to make any other material change in their respective businesses or corporate structures or management, are fair and reasonable to policyholders of [Home]." (*Id.* ¶ 10(d).) The Approval Order contemplated that Home would cease to write new policies and not renew existing policies upon expiration; Home would be limited to servicing its existing business (i.e. Home would enter "run-off"). (*See id.* at 9.) The unique nature of the transaction led the Commissioner to "specifically hold that these

Findings and Order have no precedential value for other Statements on Form A or corporate reorganizations of any kind." (*Id.* at 3-4.)

The Approval Order also directed Home to provide NHID with access to Home's books and records and placed an NHID representative on Home's board. (*Id.* ¶ 8.) Pursuant to a Consent Order issued on June 9, 1995, the NHID assumed "oversight of the day-to-day business and operations of [Home]." (Docket No. 26, at 1 ("Consent Order"); Docket No. 306-12 (Solitro) (235:10-236:8).) This oversight involved placement of an NHID Assistant Commissioner on-site, at Home's headquarters. (Docket No. 306-14 (Nichols) (97:7-99:21); Docket No. 300-4:46-8-49:23.).)

In March 1997, the New Hampshire Insurance Commissioner issued an Order of Supervision, stating that the "Commissioner shall oversee and supervise Home for the purpose of continuing and intensifying an economic, actuarial and accounting review of the books, records and affairs of the Company so as to determine what future actions would be appropriate." (Docket No. 297-4, ¶ 2 ("Supervision Order").) The Supervision Order also set monetary limits on the transactions in which Home could engage and on transactions that Home could enter into with Zurich affiliates without approval from the NHID. (Supervision Order ¶ 4.) In effect, the Supervision Order further restricted the manner in which REM could service Home without NHID approval. (Docket No. 307-3 (P. Johnson) (342:6-343:11); Docket No. 306-14 (Nichols) (192:13-194:20).) After the Supervision Order, Home could not engage in any transaction with HHI, REM, Trygg, or any Zurich affiliate without prior NHID approval. (Docket No. 306-14 (Nichols) (194:10-20).) Pursuant to the Supervision order, NHID had reviewed and approved more

than 1,000 Home business decisions by the time of rehabilitation.  (Document No. 307-2 (Bengelsdorf) (100:3-25).)

## B.    Rehabilitation and Liquidation

On March 5, 2003, the New Hampshire Superior Court issued an Order of Rehabilitation (the "Rehabilitation Order") directing the "Rehabilitator," the New Hampshire Insurance Commissioner, to "secure all of the assets, property, books, records, accounts and other documents of [Home]," and prohibiting any party from disposing of Home's assets without prior approval from the NHID.   (Docket No. 22-1, at 1 ("Rehabilitation Order").)  The Rehabilitation Order authorized the Rehabilitator, "in her discretion, to pay any and all claims for losses, in whole or in part, under policies and contracts of insurance and associated loss adjustment expenses."  (*Id.* at 3.)

"Once the [Rehabilitation Order] issued, [Home's] officers were powerless" until they were re-delegated by the Rehabilitator.  (Docket No. 307-2 (Bengelsdorf) (79:24-80:3); Docket No. 297-5, at 1.)  Officers, directors, agents, and employees of Home were "prohibited from disposing, using, transferring, removing or concealing any property of [Home], without the express written authority of the Rehabilitator."  (Docket No. 297-5, at 2; Docket No. 307-2 (Bengelsdorf) (83:22-84:6); Docket No. 304-8 (Ross) (95:23-96:7, 97:2).)   REM's CEO testified, "[NHID] became effectively the controller of [Home]."  (Docket No. 307-3 (Johnson) (320:8-13); *see* Docket No. 324-14 (Ross) (92:2-5).)

Shortly after the Rehabilitation Order, however, the Rehabilitator authorized REM "to continue to provide services to [Home] at the current rate of reimbursement," "redelegate[d] to REM the managerial powers necessary to provide such services," and "direct[ed] [REM] to continue to operate pursuant to the terms and conditions [in the March 3, 1997 Supervision Order]." (Docket No. 324-10 (Callahan) (208:11-23).) REM had authority to approve payments on claims up to $100,000; payment of claims beyond that amount required NHID approval. (Docket No. 307-2 (Bengelsdorf) (98:24-99:16).) Pursuant to this redelgation of authority, REM continued to service Home after March 5, 2003. (Docket No. 324-10 (Callahan) (208:24-209:24).)

On June 13, 2003, the New Hampshire Superior Court issued an Order of Liquidation (the "Liquidation Order"), which concluded that continued efforts to rehabilitate Home would be futile, that Home was insolvent, and that Home should be liquidated. (Docket No. 22-3, at 1-2 ("Liquidation Order").) The Liquidation Order vested the Liquidator – again, the New Hampshire Insurance Commissioner – "with title to all of the property, contracts and rights of action and all of the books and records of The Home, wherever located, and in whomever's possession they may be found." (*Id.* at 2.) The Liquidation Order directed the Liquidator to "secure all of the assets, property, books, records, accounts and other documents of The Home." (*Id.*)

## C.  REM's Operations During Home's Run-Off

As noted above, pursuant to the Services Agreement, REM began to handle on Home's behalf claims tendered under Home policies, including API's claims. (Docket

No. 326-12 (Lovick) (48:17-49:2); Docket No. 326-8; Docket No. 326-14.)   REM became Home's "exclusive agent to provide" services enumerated in the Services Agreement. (Services Agreement at 1.)  These services included managing the claims of Home's policyholders. (*Id.* at 1-2.)  Other than REM's involvement, API experienced no change following the transition to REM in how its claims were handled.  (*See* Docket No. 326-12 (Lovick) (50:22-51:9).)   The claims continued to be allocated to the "products completed operations" ("P/CO") coverage category, a category with an aggregate limit. (*See* Docket No. 326-5, 6, 7; Docket No. 304-2.)

REM was incorporated under Delaware law.  (Docket No. 304-8 (certificate of incorporation); Docket No. 321-1 (Ross) (19: 6-22).)  The entity was formed for the purpose of managing Home's business during run-off and growing its third party administration business.[4]  (Docket No. 324-10 (Callahan) (40:19-23; 53:18-54:13).) REM's board of directors memorialized the company's actions.  (Docket No. 321-1 (Ross) (25:19-26:14); Docket No. 287-6 (Callahan) (256:19-259:25).)  REM maintained bank accounts, prepared yearly statements that were audited by KPMG and Pwc, and filed tax returns. (Docket No. 321-1 (Ross) (35:4-42:21); Docket No. 287-6 (Callahan) (269:6-274:8).)  Over the years, Zurich entities invested large amounts of cash in REM and received preferred stock in return; these cash transfers were recorded as debt or

---

[4] More precisely, REM had three major businesses: a claims management business in the United Kingdom and other European countries, a third-party administration business in the United States, and the management of Home and its subsidiaries in the United States. (Docket No. 324-10 (Callahan) (68:10-24).)

equity investments.  (Docket No. 321-l (Ross) (49:9-63:2); Docket No. 287-6 (Callahan) (274:9-275:14); Docket No. 299-6.)

   While a Zurich subsidiary, REM's communications with Zurich affiliates were at "arm's length."  (Docket No. 287-6 (Callahan) (184:11-24) ("It was seldom we advised Zurich about anything of Home.  It was arm's length.  You know, we didn't want . . . Zurich in our business and frankly they didn't want to be in our business and [Home] was our business."); Docket No. 307-10 (Arrambide) (57:7-18).)  Five REM witnesses – including the former CEO, COO, General Counsel, and the claims handler for the API claims – testified that Zurich never attempted to direct REM's claim handling or otherwise interfere with REM's management of Home's run-off.[5]  The NHID controlled whether Home could pay dividends during its run-off.  (Docket No. 306-14 (Nichols) (141:10-142:7); Docket No. 306-12 (Solitro) (370:3-23).)

   At least some REM employees involved in handling Home's claims attended Zurich Global Claims Conferences to discuss claims handling.  Attendees would share best practices and other information.  (Docket No. 324-14 (Ross) (158:3-159:9; 171:4-7; 156:18-157:2).)  At least one individual holding dual officerships at REM and Home attended such a conference.  (Id. at 171:4-7; Docket No. 324-13 (Ross) (120:1-121:12).)

---

   [5] Docket No. 307-3 (Johnson) (358:11-362:1O) ("Zurich did not direct us in the handling of the . . . Home claims."); Docket No. 287-6 (Callahan) (69: 1-70:6; 184:11-24); Docket No. 307-3 (Johnson) (346:25-348:21); Docket No. 287-9 (Ross) (134:3-136:21, 152:25-153:23); Docket No. 321-1 (Ross) (292:25-294:19); Docket No. 324-11 (Moak) (139:7-19); Docket No. 308-1 (Ricigliano) (137:15-20).

REM "did not report to the Zurich Insurance Company with respect to the management of [Home]." (Docket No. 324-10 (Callahan) (70:12-16).) Rather, it "reported to the Department of Insurance in New Hampshire and . . . to the Home's directors." (*Id.*) REM would, however, have quarterly "entity visits," during which it advised Zurich representative Bill Bolinder of REM's operations, including its management of Home. (*Id.* at 70:22-73:23.) These conversations involved discussions as to "leakage management," credit negotiations, and other matters. (*Id.* at 74:6-75:4).) REM's general counsel also communicated with Zurich about Home's ownership and governance structure. (Docket No. 324-29.)

### D.     Home's Operations During Run-Off

After the Recapitalization, Home continued to exist and function. (Docket No. 291, Ex. O (Moak) (93:5-12).) As contemplated in the Approval Order, Home did not write new business; but it continued to pay claims from its own assets and perform other functions. (*Id.*; Docket No. 307-13 (Kramer) (92:20-93:9).) "Home retained liabilities related to its policy obligations," as well as liabilities from other aspects of its operations. (Docket No. 306-12 (Solitro) (432:22-434:4).)

Home continued to operate under the direction of a board, which held quarterly meetings, and took action on behalf of the company.[6] Home filed financial statements and other documents with regulatory agencies and affirmed in these filings its observance

---

[6] Docket No. 306-14 (Nichols) (108:8-109:6); Docket No. 307-3 (P. Johnson) (276:22-280:4); Docket No. 287-3-5 (minutes of Home board meetings); Docket No. 308-6, ¶¶ 66-87 (Macey Expert Report).

of corporate formalities, namely the functioning of its board and maintenance of records. (Docket No. 304-12, at 19; Docket No. 304-13, at 18-19; Docket No. 304-14, at 18, Docket No. 304-15, at 17.)   At the behest of the NHID, which hoped ultimately for the sale of Home, Home retained during its run-off – that is, did not transfer to any other entity – its name, legal corporate entity, and business licenses.  (*See* Docket No. 307-13 (Kramer) (98:19-24); Docket No. 307-14 (Marziano) (204:16-24); Docket No. 306-14 (Nichols) (408:17-409:9).)

### E.      Result of the Recapitalization for Home and Zurich

Home received a quantifiable net benefit of $786 million from the Recapitalization.  (Docket No. 308-4, at 31 (Johnson expert report); *see also* Docket No. 293 at 5 & Ex. 5 (summarizing payments from Zurich entities to Home).)  Both parties agree that, in hindsight, the Recapitalization "provided significant benefit to the Home" (Docket No. 307-11 (Faigin) (306:12-309:13)) and was "extremely expensive for Zurich," (Docket No. 307-13 (Kramer) (26:20-23; 77:21-80:7)).  Though Zurich sold REM in 2007 for a net cash payment of $13.2 million, it lost $17.9 million on its investment in REM.[7]

In concluding that the transaction was fair and reasonable to policyholders, Robert Solitro, the NHID employee tasked with making a recommendation to the Commissioner,

---

[7] Docket No. 308-4, at 41-52 (L. Johnson Expert Report) (noting loss); Docket No. 287-9 (Ross) (20:7-23:24; 61:13-62:9); Docket No. 297-2, at 7 (REM stock purchase agreement); Docket No. 287-2, at 10 n.4 (REM financial statements).

implicitly concluded that Home received more from the transaction than Zurich received. (Docket No. 306-12 (Solitro) (71:16-72:5; 208:3-209:25).) The Commission concluded, in other words, that Home's policyholders would be better off with the Recapitalization than without it. (*Id.* 133:6-134:1, 392:21-394:12.) As noted above, the NHID estimated that the net present benefit of the Recapitalization for Home's policyholders was $500 million. (*Id.* 208:3-209:25; Approval Order at 6.)[8]

The Recapitalization was ultimately a vehicle through which Zurich acquired many of Home's assets. (*See* Docket No. 307-11 (Faigin) (79:14-80:2).) Peter Johnson, CEO and Chairman of both REM and Home from 1995 to 2003, testified that "Zurich wanted to be the majority owner of the company that managed [Home] . . . ." (Docket No. 324-39 (Johnson) (202:5-24).) Zurich Insurance Company ("ZIC") "committed to insure that REM ha[d] adequate resources to me[et] its obligations" and that REM would "be able to access the Zurich actuarial, legal, insurance professionals." (*Id.* at 102:23-103:8.) Email correspondence among employees of Centre Reinsurance International ("Centre Re"), another Zurich-affiliated entity, states that Centre Re "can move . . . assets around and adjust the [H]ome portfolio's duration however Centre re wants these assets managed." (Docket No. 324-4 at 26831.)

In June 1995, Philip Harkin, Vice President of Centre Reinsurance International, sent an email to the Irish Department of Finance in which Harkin states that "Home is

---

[8] API's experts do not dispute the NHID's finding. (Docket No. 307-11 (Faigin) (243:22-244:11, 282:12-283:5, 287:7-14); Docket No. 307-13 (Kramer 27:4- 28:6).)

intrinsically part of the [Zurich Centre Investment Limited (ZCI)] Group" by virtue of Zurich's stock ownership, control of Home's board, and control of Home's business.[9] (Docket No. 324-3.)  Yet the parties involved in the Recapitalization recognized that Zurich did not agree to an unlimited assumption of Home's liabilities; indeed, the parties structured the transaction to avoid this outcome.[10]

## II.   HOME'S   ALLOCATION   OF   API'S   CLAIMS   AND   REM'S REPRESENTATION AS TO API'S REMAINING COVERAGE

Home applied aggregated limits to API's premises operations claims for years.  In 2001, API claimed that these payments, which its primary insurers made to settle more than 2,000 lawsuits, may have been misallocated to the aggregated P/CO coverage, rather than "operations" coverage, a category with no aggregate limit.   (Docket No. 305-9.) Before 2001, API and API's lawyers received updates from API's insurers about remaining limits under the various primary policies, including the Home policy; these updates reflected that Home was allocating the claims to the aggregated category. (Docket No. 304-2;  Docket No. 307-5 (Patterson) (38:24-50:22); Docket No. 307-7

---

[9] More specifically, Harkin notes that ZCI is a wholly owned subsidiary of the Zurich Group, and details that ZCI Investments will own 15% of Home's common stock, and a warrant which if exercised will give ZCI approximately 63% of Home's common stock.  Moreover, "the composition of the Board . . . ensures that the ZCI Group and its affiliates will, at all times, have a majority of members and will control the Board of [Home]."  Finally, ZCI will manage Home's run-off through an 85% subsidiary.   A reinsurance contract written by Centre Reinsurance International Company "ensures ZCI will control, manage and be responsible for the run off of the Home." (*Id.*)

[10] Docket No. 306-12 (Solitro) (87:14-88:23, 217:24-219:1, 316:12-317:12, 432:13-433:11, 494:10-23); Docket No. 306-14 (Nichols) (413:11-414:18, 519:14-23); Docket No. 307-11 (Faigin) (78:3-79:12, 92:11-93:4); Docket No. 307-13 (Kramer) (89:22-90:8); Docket No. 300-4 (hr'g tr.) (49:23-51:7); Docket No. 300-1 (Gluckstern) (54:23-59:24).

(Lovick) (64:12-21); Docket No. 324-50 (Patterson) (21:7-22:1).)   Home applied non-aggregated limits to premises operations claims in at least one other case, not involving API.   (Docket No. 324-49 (Duhig) (41:14-19; 43:16-17, 19-22).)   In December 2001, REM represented that API had $174,569 remaining in primary limits under the Home policy. (Docket No. 305-10.)

### III.   CLAIMS ON SUMMARY JUDGMENT

Following Zurich's motion for judgment on the pleadings, the Court dismissed all direct claims against Zurich – Counts 6 (fraudulent transfer), 8 (tortious interference with contractual relations), and 10 (violations of the Minnesota Consumer Protection Act). *See API, Inc.*, 706 F. Supp. 2d at 947.   The second amended complaint alleges fourteen causes of action; eleven remain following Zurich's 12(c) motion.   (Docket No. 74.)   The remaining claims are: (1) claims seeking declaratory relief as to Zurich's liability for Home's defense and indemnity obligations (claims 1, 2, 9, 12, 14), (2) breach of contract, (3) contribution rights, (4) equitable reapportionment, (5) bad faith / breach of fiduciary duty, (6) intentional / negligent misrepresentation, and (7) tortious breach of the implied covenant of good faith.

Nearly all of these claims rest on the same factual predicates.   The breach of contract, equitable reapportionment, and bad faith / breach of fiduciary duty claims are rooted in the theory that Home misallocated API's asbestos claims to a category with an aggregate limit, thereby prematurely exhausting API's coverage under the Home policies. The bad faith claim is additionally predicated on Home's (1) alleged failure reasonably to

settle a case, which API claims contributed to its bankruptcy, and (2) REM's alleged misrepresentation to API about the extent of its remaining coverage.  Both the intentional misrepresentation and the tortious breach of implied covenant of good faith claims are rooted in the same instances of alleged misallocation of claims and misrepresentation about API's remaining coverage.  In sum, except for the declaratory relief claims and the contribution rights claim, each claim rests on the factual predicates of the misallocation and/or misrepresentation.  Because API now pursues only its claims against Zurich, not Home, all claims hinge on theories of vicarious and successor liability.  API moves for partial summary judgment on its *respondeat superior* theory only.  Zurich moves for summary judgment on all remaining claims.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

- 19 -

## II.      API'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In its March 31, 2010 Order, the Court declined to dismiss API's *respondeat superior* claim on the pleadings, rejecting Zurich's argument that the Supervision Order, by subjecting any transaction involving Home to NHID approval, rendered API's claim of Zurich's ownership and control of Home defective as a matter of law. *A.P.I., Inc.*, 706 F. Supp. 2d at 942. The Court observed: "there are questions of fact about whether the separate corporate existences of Zurich and Home were disregarded and about whether Zurich controlled or had the right to control Home after the New Hampshire court issued the Consent and Supervision Orders." *Id.* On its motion for partial summary judgment, API now argues that Zurich is liable for both Home's policy obligations and its torts from the time when Zurich allegedly obtained the right to control Home, June 12, 1995, until the date of its liquidation, June 13, 2003.

### A.      API's *Respondeat Superior* Theory (Agency)

Traditional vicarious liability rules ordinarily make principals vicariously liable for acts of their agents committed in the scope of the agents' authority or employment. *Meyer v. Holley*, 537 U.S. 280, 285 (2003). An agency relationship can exist between corporations, such as when one corporation makes a contract on the other's account; likewise, a subsidiary may become an agent for the corporation which controls it. Restatement (Second) of Agency § 14M cmt. A; *see also A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 291-92 (Minn. 1981) (corporate creditor's control over corporate debtor supported a jury verdict imposing liability on the creditor). The right of

control, and not necessarily the exercise of that right, is the test of the relation of principal

and agent.  *See, e.g., Cornish v. Kreuer*, 228 N.W. 445, 446 (Minn. 1929).  The

principal's right to control the agent must be extensive; the control must not merely be

over what is to be done, "but primarily over [h]ow it is to be done."  *Frankle v. Twedt*, 47

N.W.2d 482, 487 (Minn. 1951).  Yet the "right to control" is insufficient by itself to

establish a principal/agent relationship.  *See Meyer*, 537 U.S. at 286, 290.  The principal

must also manifest its consent that the agent act on its behalf, and the agent must manifest

its assent to act as the principal's agent.  *Id.* at 286; *see also Jurek v. Thompson*, 241

N.W.2d 788, 791 (Minn. 1976); *Frank v. Winter*, 528 N.W.2d 910, 914 (Minn. Ct. App.

1995).  In short, an agency relationship requires (1) manifestation of consent to the

relationship by both principal and agent, and (2) right of control by the principal over the

agent.  *See A. Gay Jenson Farms Co.*, 309 N.W.2d at 290; *Jurek*, 241 N.W.2d at 791.

Worth emphasizing is that the principal is only liable for the acts of its agent committed

within the scope of the agency.  *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 535

(Minn. 1992).

The parties paint two markedly different versions of the Home-REM-Zurich

relationship.  In API's rendering, Home became Zurich's agent through the various

agreements executed in connection with the Recapitalization; in Zurich's rendering, the

Zurich-owned REM became **Home's** agent.  API's theory is that the various agreements

executed and representations made in connection with the Recapitalization rendered

Home Zurich's agent and Zurich Home's principal.  API reasons, therefore, that Zurich is

liable for alleged malfeasance committed in the Recapitalization's wake.  API is less than

clear about for precisely which of Home's actions Zurich is liable; the thrust of API's argument is that because Zurich had the right to control Home's actions, it is liable for various misdeeds – "breaches, injuries, damages, including an 8 million dollar verdict, Home's subsequent denials of coverage and API's bankruptcy . . . " (API Reply Br. at 4 n.2, Aug. 19, 2011, Docket No. 335) – that Home (or REM) committed with respect to API from the 1995 Recapitalization until Home's liquidation in June 2003. This list includes, most notably, Home's alleged misallocation of API's claims to a non-aggregated coverage category, and REM's alleged misrepresentation as to API's remaining coverage.

As described below, the Court finds that API is not entitled to summary judgment because it has demonstrated neither that Zurich and Home consented to an agency relationship nor that Zurich had the right to control Home's activities that allegedly led to API's injuries. More specifically as to the latter point, API has not demonstrated that Zurich had the right to direct Home's handling of API's claims, the alleged source of API's injury. *See, e.g., Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988) (arrangement constituting agency "must be relevant to the plaintiff's claim of wrongdoing").

### 1.    Consent to Agency Relationship

API has not demonstrated that Zurich consented to an agency relationship with Home, or that Home consented to act as Zurich's agent. API's claimed indicia of consent are studiously vague. API relies on (a) testimony during the 1995 hearing regarding

ZIC's desire to "control" Home and intention to "operate" Home in a fair manner, (b) REM's formation to manage Home's operations, (c) the NHID's May 26, 1995 Order approving the Recapitalization, which noted Zurich's commitment that it would operate Home in a fair and reasonable manner, (d) emails from Zurich personnel suggesting that Home is part of the Zurich group, and (e) the various agreements executed in connection with the Recapitalization.

On its face, none of this evidence manifests Home or Zurich's consent to an agency relationship. The various agreements executed in connection with the Recapitalization, for example, do not purport to demonstrate such consent. Indeed, the Services Agreement quite explicitly made REM **Home's** agent, not the other way around: Home "appoint[ed] REM as [its] exclusive agent." (Services Agreement at 1.) Even if REM existed for the sole purpose of managing Home's run-off – and the record shows that REM had two major business functions apart from its management of Home and its subsidiaries in the United States (Docket No. 324-10 (Callahan)(68:10-24)) – that fact, in itself, does not speak to either party's consent to an agency relationship. Similarly, the Renewal Rights Agreement did not authorize Home to act as Zurich's agent; rather, it required Home to provide reasonable access to its books and records and cooperate with Zurich's efforts to compete for business from former Home policyholders. Simply requiring one company to cooperate with another does not create an agency relationship. *See Cardiac Pacemakers, Inc. v. Aspen II Holding Co.,* 413 F. Supp. 2d 1016, 1020, 1025 (D. Minn. 2006). API points to no specific provision of any of the various agreements executed in connection with the Recapitalization that suggests Zurich's appointment of

Home as its agent or authorizes Home to bind Zurich to its contracts. And while some testimony and other evidence references Zurich's desire to acquire ultimate ownership of Home assets, to "control" Home, or suggests that Home is "part of" Zurich, no evidence speaks directly to either Home or Zurich's consent to an agency relationship. *Cf. Jurek*, 241 N.W.2d at 791 (no agency relationship absent, *inter alia*, manifestation of alleged agent's consent to act as an agent).

API appears to admit the absence of any explicit agreement to the agency relationship it urges the Court to recognize; at a minimum, it points to no direct recognition of such an arrangement. Although an agency relationship may exist even if the parties did not call it agency or intend the legal consequences of an agency relationship, to infer such an arrangement the alleged agent must be conducting the alleged **principal's** business, not its own. *See Cargill, Inc.*, 309 N.W.2d at 290-91 (inferring agency relationship where agent acted on principal's behalf); *Porter v. Grenna Bakeries*, 16 N.W.2d 906, 909-10 (Minn. 1944) (observing that vicarious liability is appropriate not because the principal authorized a particular act, but "because the servant is conducting the master's business"). Here, following the Recapitalization, REM – as **Home's** agent, (Services Agreement at 1) – continued to conduct the business of servicing Home's existing policyholders. Home's policy obligations remained its own, and policy payments came out of Home's assets. The Court will not infer, therefore, that Home acted as Zurich's agent. *Cf. Cargill, Inc.*, 309 N.W.2d at 290-91.

Even if there were an agency relationship, Zurich cannot be liable unless Home was acting within the scope of its agency when it caused the alleged injury. *See Semrad*,

493 N.W.2d at 535 (principal liable only for acts of agent committed within the scope of agency and "not for a purpose personal to the agent"). In API's view, after the Recapitalization, managing Home was **Zurich's** business – not Home's business. But this argument sweeps too broadly because API makes no attempt to delineate the precise scope of the alleged agency relationship. Rather, API appears to argue that because Zurich ultimately owned REM and "caused" it to enter into the Services Agreement, Zurich necessarily had the right to control all aspects of REM's business, including its management of Home's claims-handling. That is far from a foregone conclusion as a matter of basic corporate law. *See, e.g., United States v. Bestfoods Inc.*, 524 U.S. 51, 61-62 (1998) (noting the unremarkable principle that, generally, parent corporations are not liable for the acts of their subsidiaries). Moreover, API's argument completely elides the actual language of the various agreements executed in connection with the Recapitalization, none of which purports to create the arrangement API contends exists and one of which expressly creates the opposite relationship by making REM **Home's** agent. (Services Agreement at 1.)

In sum, API seeks to leverage references about Zurich's control of Home, or the close relationship between the entities into consent by both parties to an agency relationship. Absent any attempt to delineate the scope of the agency relationship, and in the face of undisputed evidence that Home (via REM) continued to service **its** existing policies – and not undertake some new venture at Zurich's behest – API cannot do so.

## 2.  Right to Control Conduct Leading to Injury

As noted above, the principal's right to control the agent must be extensive, not just over what to do but over how to do it. *See Frankle*, 47 N.W.2d at 487. Crucially, the principal's ability to control the agent must embrace the specific conduct underlying the plaintiff's claims. *See Phoenix Canada*, 842 F.2d at 1477; *Mobile Oil*, 718 F. Supp. at 271-72. API claims injury arising from, among other sources, Home's denial of coverage and REM's alleged misrepresentation of API's remaining primary limits: in other words, injury flowing from the handling of Home's claims. To prevail on its *respondeat superior* theory, therefore, API must demonstrate that Zurich had the ability to control Home's handling of API's claims.

API does not make that showing. The record makes plain that REM – as Home's "exclusive agent" under the Services Agreement – managed Home's claims. REM was at all times a separate corporation, with a functioning board of directors, bank accounts, and audited financial statements. It is not a defendant in this action. REM continued to allocate API's claims to the same coverage category as Home did before the Recapitalization. API points to no evidence showing that Zurich directed REM's handling of Home's claims. Indeed, the record amply suggests that it did not: five REM witnesses, including the former CEO, COO, General Counsel, and the claims handler for the API claims, all testified that Zurich never attempted to direct REM's claim-handling or otherwise interfere with REM's management of Home's business. REM's communications with Zurich affiliates, in other words, were at "arm's length." In short,

API points to no direct evidence showing that Zurich controlled – or had the right to control – Home's claims handling through REM.[11]

To demonstrate control, API instead appears to rely on Zurich's ultimate ownership of REM.  Worth emphasizing given the parties' apparent confusion on the matter is that in determining whether one corporation will be held liable for the acts of another, "agency" and "alter ego" are distinct theories of liability.  *See, e.g., Phoenix Canada Oil Co.*, 842 F.2d 1476-77 (discussing each as distinct theories of liability); *see also Mobil Oil Corp.*, 718 F. Supp. at 266 (discussing courts' inconsistent use of terminology).  Until now, the Court has been addressing what might be called "pure agency" theory, which does not require ownership of one entity by another.  *Mobil Oil Corp.*, 718 F. Supp. at 266 n.9.  "Agency" in the sense of complete domination or control, however, is the same as alter ego liability.  *Id.* at 271 n.15.  Because shareholders are not responsible for the corporation's liabilities, *Bestfoods Inc.*, 524 U.S. 61-62, to prevail on an "agency" theory predicated on Zurich's complete domination or control of

---

[11] *Urban v. American Legion* and the Restatement (Third) of Agency, the only authorities apart from this Court's March 2010 Order on which API relies, do not advance its cause.  While the Restatement offers a fine definition of agency, it sheds no light on how Zurich became Home's principal, Home Zurich's agent, or how Zurich obtained the right to control Home's claims handling. *See* Restatement (Third) of Agency § 1.01 (2006).  *Urban* **declined** to extend the *respondeat superior* theory to hold the national branch of the American Legion vicariously liable under Minnesota's Civil Damages Act ("CDA") for the local post's alleged service of alcohol to an intoxicated person. *Urban v. Am. Legion Dep't of Minn.*, 723 N.W.2d 1, 7 (Minn. 2006).  Because the court rested its decision on the language of the CDA, it found "an in-depth examination of *respondeat superior* law [to be] unnecessary." *Id.*  Indeed, Justice Hanson notes in dissent that the Minnesota Supreme Court "[h]as not addressed the precise situation" of *respondeat superior* liability for a corporate parent for the actions of its subsidiary. *See id.* at 12-13 (Hanson, J., dissenting).  Worth highlighting is that the situation here is even further removed from that scenario: API claims the alleged principal exercised control over the alleged agent through yet another legally distinct entity.

Home through REM, API must pierce REM's corporate veil. *See id.* at 62-63 (describing veil-piercing); *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979) ("corporate existence cannot be allowed to shield the individual from liability" where the parent abuses the corporate form to perpetrate an injustice).

API does not urge the Court to pierce REM's corporate veil on its motion, and the record does not compel it. While Minnesota courts have described the veil-piercing inquiry in terms of a two-part test – (1) abuse of the corporate form, and (2) fundamental unfairness, *Ass'n of Mill and Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449-51 (Minn. Ct. App. 1996) – those prongs are intimately related. Ultimately, the question is whether Zurich abused the corporate form to perpetrate an injustice such that failure to pierce the veil would be fundamentally unfair.[12] *See Victoria Elevator Co.*, 283 N.W.2d at 511-12. On API's motion, the Court construes facts in the light most favorable to Zurich, and will pierce the veil only if no reasonable juror could find otherwise. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

First, it is far from clear that Zurich abused REM's corporate form. REM was incorporated under Delaware law. REM's board of directors memorialized the company's actions. REM maintained bank accounts, prepared yearly statements that

---

[12] Relevant factors in considering whether Zurich abused the corporate form include: insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings. *Victoria Elevator Co.*, 283 N.W.2d at at 512. A "number" of these factors must be present to satisfy the first prong of *Victoria Elevator*. *Minn. Power v. Armco, Inc.*, 937 F.2d 1363, 1367 (8th Cir. 1991).

were audited by KPMG and Pwc, and filed tax returns. As described above, while a Zurich subsidiary, REM ensured its communications with Zurich affiliates were at "arm's length": five REM witnesses testified that Zurich never attempted to direct REM's claim handling or otherwise interfere with REM's management of Home's run-off. API points to no on-point record evidence showing that REM was insolvent or undercapitalized when formed, or that Zurich siphoned funds from REM. Indeed, over the years Zurich entities invested large amounts of cash in REM and received preferred stock in return. These cash transfers were recorded as debt or equity investments. Moreover, NHID, not Zurich, controlled whether Home could pay dividends. As for the non-functioning of officers, while some corporate officers and directors wore hats in both REM and Home, that practice is not improper. *See Bestfoods*, 524 U.S. at 69.

Zurich and Home were closely related, of course. In essence, the complex Recapitalization was Zurich's attempt as an investor to revitalize Home and turn a profit, though both objectives ultimately failed. Hence Robert Solitro's statement that "Zurich, as a result of the application, was given control over certain activities of [Home], which included investments, management operations, and the runoff of the operation." (Docket No. 306-12 (Solitro) (497:10-20).) Some REM employees involved in handling Home's claims attended Zurich claims handling conferences. REM communicated with Zurich about Home's reorganization. REM's quarterly "entity visits," during which it advised a Zurich representative of its operations, including its management of Home, are yet another example of this close relationship. But the Court finds that the various manifestations of this relationship on which API relies do not add up to abuse of REM's

- 29 -

corporate form or support the conclusion that Home was operating as a mere façade for Zurich.[13] Veil-piercing, therefore, is not warranted. *Cf. Ass'n of Mill and Elevator Mut. Ins. Co.*, 553 N.W.2d at 450-51 (declining to pierce the veil where most of the *Victoria Elevator* factors reflect corporate separateness).

In sum, because API has demonstrated neither Zurich nor Home's consent to an agency relationship, nor Zurich's ability to control the claims-handling that allegedly gave rise to API's injury, nor that the record compels disregarding REM's corporate form, the Court will deny API's motion for partial summary judgment.

## III.   ZURICH'S SUMMARY JUDGMENT MOTION

Zurich moves for summary judgment on all API's claims. The only remaining claims following the Court's March 31, 2010 Order are predicated on vicarious and successor liability. The Court will first address the threshold bases for dismissal that Zurich advances. It will then address the merits of API's theories of liability. Because

---

[13] As another example, API takes out of context REM Associate General Counsel Joel Ross's statement that "It wasn't like we had a separate REM company or a separate Home company." (Docket No. 324-13) (161: 5-6).) Ross "meant that REM did not really have two companies, a company to handle non-Home business and a company to handle Home business"; he was "not testifying that Home and REM were the same company. (Docket No. 324-14 (Ross) (274:14-276:8).) API's reliance on this statement also reveals the problem behind its legal theory: even if REM and Home acted as one entity, API would be no closer to demonstrating that **Zurich** acted improperly so as to warrant veil piercing because non-party REM, which itself observed corporate formalities, is legally distinct from Zurich.

Similarly, API's February 2012 supplementation of the voluminous summary judgment record does not, as API argues, "add[] yet one more factor in favor of finding that [Zurich is] the alter ego[] of Home." (Docket Nos. 357, 358.) That Home's former parent company HHI, following its bankruptcy reorganization, joined the Zurich Holding Company of America consolidated tax group does not constitute evidence that **Home**, which was not owned by the reorganized HHI and did not consolidate its tax returns with Zurich, is an alter ego of Zurich.

the Court finds that on this record each theory fails as a matter of law, it will grant
Zurich's motion.

### A.    Threshold Bases to Dismiss API's claims

Zurich advances various threshold bases on which to dismiss API's claims.
Zurich argues that (1) the Approval Order collaterally estops API from raising its claims,
(2) the doctrine of exclusive jurisdiction precludes the Court's consideration of API's
claims, and (3) API's claims are either time-barred or moot.  The Court will briefly
address each argument in turn; it concludes that none of these theories preclude, as a
threshold matter, consideration of API's claims.

### 1.    Collateral Estoppel

The issue is whether API's attempt to impose liability on Zurich amounts to an
impermissible collateral attack on the Approval Order.  Collateral estoppel, or issue
preclusion, is a procedural rule that "precludes parties to an action from relitigating in
subsequent actions issues that were determined in the prior action." *State v. Lemmer*, 736
N.W.2d 650, 658 (Minn. 2007) (quotation marks and citation omitted).  The doctrine
applies when (1) the issue subject to estoppel was identical in each action, (2) the first
action resolved the issue finally on the merits, (3) the party to be estopped appeared in the
first action or was in privity with someone who did, (4) the party to be estopped had a full

and fair opportunity to litigate the issue, and (5) the finding was essential to the first judgment. *Farm Family Mut. Ins. Co. v. Peck*, 731 A.2d 996, 998 (N.H. 1999).[14]

Both parties are imprecise about exactly which "issues" in this litigation are the "same" as those conclusively decided in the Approval Order, and about how those issues bear on API's legal claims. Zurich argues that collateral estoppel bars all of API's claims; API argues that the Approval Order has nothing to say about its claims, which sound largely in contract and tort.[15]

The Court finds that collateral estoppel does not bar API's claims. First, the doctrine is arguably relevant to only **some** of API's theories of liability. Again, those theories are: (1) alter ego, (2) *respondeat superior*, (3) joint venture, and (4) successor liability. The sole quasi-legal issue necessarily and conclusively determined in the complex and protracted Form A process was that the Recapitalization was fair and reasonable to the policyholders. The Form A proceedings and the resulting Approval

---

[14] Because New Hampshire rendered the first judgment, its law controls the issue preclusion analysis. *St. Paul Fire and Marine Ins. Co. v. Compaq Computer Corp.*, 539 F.3d 809, 821 (8th Cir. 2008). The doctrine applies to agency determinations if the determination "is rendered in a judicial capacity and resolves disputed issues properly before it which the parties have had an adequate opportunity to litigate." *Morin v. J.H. Valliere Co.*, 309 A.2d 153, 155 (N.H. 1973). An act is judicial if officials "are bound to notify, and hear the parties, and can only decide after weighing and considering such evidence and arguments, as the parties choose to lay before them." *In re City of Keene*, 693 A.2d 412, 414 (N.H. 1997). Under New Hampshire law, the NHID Commissioner was acting "in a quasi-judicial capacity." N.H. Rev. Stat. Ann. § 400-A:23(I).

[15] API's threshold argument that an interlocutory opinion from the California Court of Appeals collaterally estops Zurich from raising issue preclusion is without merit because interlocutory decisions do not have preclusive effect. *See Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1067-68 (D. Minn. 1999).

Order, of course, addressed far more than that narrow issue. The various agreements executed in connection with the Recapitalization, for example, deal with issues plainly relevant to API's legal theories: the Services Agreement mentions joint venture, for instance, if only to aver that the agreement does not create one. The Approval Order itself also references Zurich's "plans or proposals to liquidate, sell the assets of, consolidate or merge the Insurers . . . ." (Approval Order ¶ 10(d).) Consolidation or merger are relevant to successor liability. *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn. 1989). But the NHID was not confronted with legal theories; it was tasked with determining whether the Recapitalization was fair and reasonable to policyholders. *See* N.H. Rev. Stat Ann. § 401-B:2(II)(c); (*see also* Docket No. 306-12 (Solitro) (153:23-154:6, 493:19-494:1; 41:9-24; 62:8-12).)

Even without the Commissioner's caution that its findings and order "have no precedential value for other statements on Form A or corporate reorganizations of any kind," this Court could not conclude that other issues on the margins of the NHID's approval are "identical" to those presented here, or that the NHID purported to "finally resolve" them. *See Peck*, 731 A.2d at 998. The Form A process simply did not purport to do that. Each of API's vicarious liability theories contains different elements, and fairness is only a requirement for two of them – alter ego and *respondeat superior* – and then only to the extent that those theories entail veil-piercing, which in Minnesota requires unfairness. *Victoria Elevator Co.*, 283 N.W.2d at 512. Moreover, it is far from clear that the unfairness the NHID found to be absent in the Recapitalization is the same kind of "unfairness" contemplated in the veil-piercing inquiry under Minnesota law.

Veil-piercing is warranted only if fundamental unfairness would occur in its absence –
that is, if the defendant's abuse of the corporate form would work an injustice to the
plaintiff.  *See Stoebner*, 115 F.3d at 579.  As API clarified at oral argument, the
unfairness of which it complains is not the structure that the NHID approved, but rather
the allegedly inequitable handling of Home's claims (and the results flowing therefrom),
which occurred **after** the Recapitalization.  In sum, because the issues determined in the
Approval Order are not identical to the issues raised here and, in any event, the NHID did
not purport to finally resolve those issues, collateral estoppel does not apply.

### 2.   Exclusive Jurisdiction of State Insurance Regulators

Courts should defer to the exclusive jurisdiction of state regulators where the
regulatory review process is designed "to be exclusive."  *Comp. Dep't of Dist. Five,
United Mine Workers of Am. v. Marshall*, 667 F.2d 336, 340 (3d Cir. 1981).   Such
decisions "may not be collaterally attacked in district courts."  *N. Am. Sav. Ass'n v. Fed.
Home Loan Bank Bd.*, 755 F.2d 122, 124-26 (8th Cir. 1985).  Similarly, where Congress
prescribes review of an administrative decision in the appellate court, "[d]istrict judges
may not enjoin or penalize action that the agency has approved or that is the natural
outcome of the agency's decision."  *Ordower v. Office of Thrift Supervision*, 999 F.2d
1183, 1188 (7th Cir. 1993); *see also Harr v. Prudential Fed. Savs. & Loan Ass'n*, 557
F.2d 751, 754 (10th Cir. 1977) (rejecting fraud claims as collateral attack on agency
decision).   The issue is whether the detailed, comprehensive regulatory framework
governing Form A proceedings, including a provision allowing policyholders to

challenge NHID's determinations in New Hampshire state court, prevents the Court from entertaining API's claims.

The Court finds that it does not. While mindful of the National Association of Insurance Commissioners view that "this litigation threatens to upset the national regulatory scheme for the orderly consideration of transactions falling within the scope of the Model Holding Company Act" (NAIC Amicus Br., at 4, July 28, 2011, Docket No. 319), the Court finds that reading the doctrine of exclusive jurisdiction to bar API's claims would sweep beyond extant caselaw and unnecessarily circumscribe judicial review of conduct that may be outside the ambit of regulatory approval.

The cases on which Zurich relies relate to more direct challenges to agency determinations than API presents in this action. *Marshall*, for example, dealt with a party's challenge to the Labor Secretary's interpretation of the Black Lung Act. *Marshall*, 667 F.2d at 340. *North American Savings Association* dealt with a self-styled injunctive action challenging an agency proceeding, which the court found to be a *de facto* challenge to the agency's approval of an acquisition. *N. Am. Sav. Ass'n*, 755 F.2d at 124-26. The statutory scheme governing agency action in these cases provided exclusive jurisdiction in the court of appeals to challenge the agency's action, and the courts dismissed for want of jurisdiction.[16] *Id.*; *Marshall*, 667 F.2d at 340.

As in these cases, the statute at issue here provides the exclusive means to challenge agency action. *See* N.H. Rev. Stat § 401-B:14 (appeal right); N.H. Rev. Stat.

---

[16] Similarly, the statute at issue in *Ordower* vested review of the administrative decision in the court of appeals. *Ordower*, 999 F.2d at 1188.

§§ 541:1-6 (appeal procedure); *Nashua v. Pub. Utils. Comm'n*, 148 A.2d 277, 279-80 (N.H. 1959) (stating that where a comprehensive statutory scheme makes a specific provision for judicial review, that mechanism is deemed the exclusive avenue for challenging agency action).  Unlike these cases, however, API's breach of contract and tort claims do not represent an unmistakable challenge to the agency action because they do not hinge on whether the NHID-approved Recapitalization was fair and reasonable to Home's policyholders.

A litigant cannot collaterally attack the "substance" of an agency-approved transaction outside the prescribed mechanism for doing so, and cannot advance arguments whose "sole thrust" is such a challenge. *Ordower*, 999 F.2d at 1188; *Harr*, 557 F.2d at 754; *see also Merritt v. Shuttle, Inc.*, 187 F.3d 263, 271 (2d Cir. 1999) (rejecting challenge where adjudication was "inescapably intertwined" with review of agency decision).  It does no violence to this principle, however, to note that claims rooted in alleged conduct **not** embraced by agency approval do not fall outside the reach of judicial review.

Many of API's theories are predicated on allegedly improper conduct that occurred **after** the Recapitalization: the December 2001 representation as to API's remaining coverage, Home and REM's post-Recapitalization coverage decisions, etc. The heart of these claims is not that the NHID and other regulators were incorrect to conclude that the Recapitalization was fair and reasonable to policyholders such as API. Rather, it is that Zurich somehow acted improperly, e.g., by abusing REM's corporate form to direct Home's business for its benefit and at the expense of Home's

- 36 -

policyholders.   The Approval Order, of course, did not insulate any entity from civil liability for conduct, improper or tortious, which the regulators did not contemplate.  For the reasons set forth in Part III.B, *infra*, the Court ultimately concludes that API's theories cannot survive summary judgment.  But where, as here, the factual basis of a plaintiff's claims is separable from the substance of an agency decision, the proper course of action is not to insulate the claims from review, but to address them on the merits.[17]

### 3.    Timeliness or Mootness of API's Claims

The next two threshold issues are whether API's claims are either time-barred by the six-year Minnesota statutes of limitations, *see* Minn. Stat. § 541.05 subd. 1(1) (contract claims); *id.* § 541.05 subd. 1(6) (fraud claims); *id.* § 541.05 subd. 1(2) (statutory claims), or moot following NHID's assumption of control of Home.

Zurich was served with the amended complaint on March 25, 2009, and, therefore, any claim accruing prior to March 25, 2003, would ordinarily be time-barred.  Because the Court finds that API's theories of liability cannot survive summary judgment on their own terms, it need not decide whether API's amended complaint relates back to the date

---

[17] Zurich can be forgiven for reading the "substance" or "thrust" of API's claims as an impermissible challenge to regulatory action. *See Ordower*, 999 F.2d at 1188; *Harr*, 557 F.2d at 754.  API's briefing is rife with statements such as "The Recapitalization Agreements Were Structured to Benefit Zurich, not Home" and "THE FINAL ORDER ALLOWED ZURICH TO TAKE CONTROL OF HOME." (Mem. in Opp'n to Defs.' Mot. for Summ. J., at 2, 41, July 29, 2011, Docket No. 322.)  The Court acknowledges that its understanding of API's argument – rooted largely in API's clarification at oral argument about the nature of the unfairness it alleges – is charitable to API in this respect.

of the state court complaint, which is within the statute of limitations.  The Court will assume that API's claims are not time-barred.

The next question is whether API's claims against Zurich are moot as to post-March 5, 2003 conduct.  After the March 5, 2003 Rehabilitation Order, NHID had the sole authority to make payment decisions.  If NHID, and not REM or any other Zurich-affiliated entity, was solely responsible for Home's claims-management after that date, then imposition of vicarious liability on Zurich after that date would be improper.  While the language of the Rehabilitation Order strongly suggests that Zurich could not be vicariously liable after March 5, 2003, the Court declined to dismiss the claims on Zurich's Rule 12 motion because it found the effect of the Rehabilitation Order on Zurich's relationship with Home to be a fact question.  *API, Inc.*, 706 F. Supp. 2d at 943.

The Court finds that API's claims are not automatically moot following the Rehabilitation Order.  While the NHID did take control of Home under the Rehabilitation Order, the Rehabilitator almost immediately authorized REM to continue servicing Home and re-delegated to REM the managerial powers necessary to provide those services.  It continued to do so.  Therefore, because REM continued to make payment decisions after the Rehabilitation Order, the Court finds that Zurich is not automatically entitled to summary judgment as to claims arising after March 5, 2003.

- 38 -

**B.      Vicarious liability theories**

API seeks to hold Zurich liable for Home's actions on theories of alter ego, *respondeat superior*, joint venture, and successor liability. The Court reviews each theory in turn.

**1.      Alter ego**

In using the alter ego theory to pierce the corporate veil, Minnesota courts look at the reality and not the form with respect to how the corporation operated. *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007).[18] Veil-piercing is an equitable remedy, permitted only in limited circumstances where (1) the corporation fails to maintain a sufficiently separate identity, i.e. is an alter ego or mere instrumentality of a shareholder, and (2) failure to pierce the veil would result in some fundamental unfairness, fraud, or injustice. *See Victoria Elevator Co.*, 283 N.W. 2d at 512; *Trustees of the Graphic Comm'cns. Int'l Union Upper Midwest Loc. 1M Health and Welfare Plan v. Bjorkedal*, 516 F.3d 719, 731 (8th Cir. 2008).[19] API must raise a genuine issue of material fact as to both elements to avoid summary judgment. *Bjorkedal*, 516 F.3d at

---

[18] State law governs piercing the corporate veil in the Eighth Circuit. *Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997).

[19] *See also* 1 *Fletcher* § 41.10, at 157 (cum. supp. 1988) ("if an intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, equity has the authority to tear down technical legal barriers and . . . grant proper relief"); 1 *Fletcher* § 43, at 203 (cum. supp. 1988) ("Although wrongdoing by a parent corporation need not amount to plain fraud or illegality, the injured party must show some connection between its injury and the parent's improper manner of doing business – without that connection, even where the parent exercises domination and control over the subsidiary, corporate separateness will be recognized.").

731; *see also Carpenters and Joiners Welfare Fund v. Wayne*, Civ. No. 02-779, 2003 WL
21730105, at *3 (D. Minn. July 21, 2003) (granting summary judgment for failure to
show unfairness).

Having concluded in connection with API's motion that the record does not
**compel** veil-piercing, the Court now faces the question on Zurich's motion of whether
the record **permits** it. *See Matsushita Elec. Indus., Co.*, 475 U.S. at 587-88 (inferences
drawn from underlying facts must be construed in the light most favorable to the non-
movant). While a host of undisputed evidence demonstrates that Home (and REM)
maintained separate corporate existences, other record evidence, some of which was
discussed above in connection with API's motion, makes plain that Zurich and Home
were closely related indeed. Nonetheless, as described below, even assuming Zurich
exercised some influence over Home's operations by virtue of its ultimate ownership of
REM – through, for example, the attendance at Zurich Global Claims Conferences of an
individual holding dual officerships at REM and Home – the record does not demonstrate
that Zurich used that control to perpetrate a fraud or injustice, or that failure to pierce the
veil would result in the kind of fundamental unfairness that the law requires. That fact
alone warrants summary judgment. *See Bjorkedal*, 516 F.3d at 731; *Wayne*, 2003 WL
21730105, at *3.

### a.  Fraud, Injustice, or Fundamental Unfairness

API argues that "it would be unjust and fundamentally unfair to not hold Zurich
liable for Home's obligations to the Plaintiffs under these facts," because while Home
was in financial trouble in 1995, "it had other options than to be acquired by Zurich."

(Pls.' Opp'n at 34-35.)  The argument is that Home, while under Zurich's control through REM, failed properly to apply API's coverage and misrepresented the amount of coverage that remained under API's policies; these actions, API argues, led to its bankruptcy.  The fundamental unfairness of which API complains, then, is the eventual result of the Recapitalization and API's allegedly resulting bankruptcy.

The parties' focus on whether the Recapitalization itself was "fair" to policyholders is something of a distraction.  It does not resolve the issue to observe that Home received a quantifiable net benefit of $786 million from the Recapitalization, or that API's experts concede that the deal was, in retrospect, very beneficial to Home and expensive for Zurich.  (Docket No. 307-11 (Faigin) (306:12-309:13); Docket No. 307-13 (Kramer) (26:20-23; 77:21-80:7).)  For its part, API clarified at the hearing that the unfairness of which it complains occurred after the Recapitalization: Zurich failed to keep its promise to be fair and reasonable by inappropriately denying or otherwise mishandling API's claims (again, through REM).

The question is thus not whether the Recapitalization as approved was "fair," but whether Zurich dominated Home to perpetrate a fraud or injustice such that failure to now hold it accountable would be fundamentally unfair.  *See Victoria Elevator*, 283 N.W.2d at 512; *White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn. 1982) (second prong requires "evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner") (internal quotation marks and citation omitted).  The kind of unjust conduct satisfying the unfairness test must be a "wrong beyond a creditor's inability to

collect." *In re Intelefilm Corp.*, 301 B.R. 327, 332 (Bankr. D. Minn. 2003) (quoting *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522-23 (7th Cir. 1991)).

API offers no persuasive evidence of the kind of fraud or unfairness that the law requires to justify veil-piercing. The narrative API mounts about Laurence Cheng's "infiltration" of Home for Zurich's benefit is emblematic of the vague attribution of improper conduct that pervades API's case for veil-piercing. Specifically, API argues that Cheng used inside information about Home to make a profit for Zurich and improperly donned both Zurich and Home hats during the Recapitalization. That story is difficult to square with the record. Cheng recused himself from consideration of the Agreement in Principle that formed the basis of the Recapitalization. Moreover, Cheng did not enter into Recapitalization-related agreements on behalf of both Zurich and Home, but rather signed documents on behalf of corporations whose boards had already approved those transactions. (*See* Docket 324-38 (Cheng) (175:13-176:17); Docket No. 334-3 (Macey) (181:5-183:8) (describing that Cheng signed the documents as an agent of the corporations, not as a corporate decisionmaker).) And the "inside" information about the market value and duration of Home's investment portfolio that Cheng shared with Zurich was publicly available in Home's regulatory and SEC filings. In short, API insinuates, but does not demonstrate, that Cheng's behavior was somehow improper. None of this evidence suggests that Zurich operated Home – again, assuming that it did so through REM – to perpetrate a fraud or injustice.

In the same way, API does not demonstrate that leaving REM's corporate form intact would result in the kind of injustice that the law requires. To the extent API alleges

unfairness, it roots this claim in Home's alleged misrepresentation of coverage, misallocation of claims, and improper denial of claims following the Recapitalization, which API claims led to its bankruptcy. These actions – assuming they can be attributed to Zurich – cannot supply the necessary fraud or injustice because to hold otherwise would render the unfairness element meaningless and sanction bootstrapping. *Mobile Oil*, 718 F. Supp. at 268. Every tort or breach of contract is, of course, "unjust" or "unfair" in some sense. *Id.* API is left, then, only with either diaphanous suggestions of corporate misconduct – Cheng's "infiltration" of Home, Peter Johnson's serving as an officer and director in both REM and Home, etc – or the claim that failure to pierce the veil would leave API without just compensation. The former does not justify veil-piercing because such conduct is either belied by the record or not demonstrative of improper conduct. The latter, again, simply restates API's claim as to why Zurich should be liable in the first place. Akin to a creditor alleging injustice because it cannot collect a debt, this kind of "injustice" is insufficient as a matter of law to justify veil-piercing. *See In re Intelefilm Corp.*, 301 B.R. at 332; *Mobile Oil*, 718 F. Supp. at 268.

In sum, because API has not raised a genuine issue of material fact regarding whether Zurich abused the corporate form to perpetrate an injustice or that failure to pierce the veil would result in the kind of unfairness that the law requires, the Court will grant summary judgment for Zurich on the alter ego theory.

### 2.   *Respondeat Superior*

*Respondeat superior* liability is predicated on traditional agency principles.   The Court found in Part II.A, *supra*, that summary judgment for API was not warranted because API has demonstrated neither that Zurich and Home consented to an agency relationship nor that Zurich controlled or had the right to control Home's activities that allegedly led to API's injuries.   The Court finds that construing the facts in the light most favorable to API on Zurich's motion does not change that analysis.   For the reasons set forth in Part II.A, the Court finds that Zurich, not API, is entitled to summary judgment on the *respondeat superior* theory.

### 3.   Joint Venture

"Although in some circumstances whether a joint venture exists can be determined as a matter of law, the issue is generally a question for the fact-finder to determine."   *Am. States Ins. Co. v. Ankrum*, 651 N.W.2d 513, 522 (Minn. Ct. App. 2002).   The elements of a joint venture are:

> (1) contribution, i.e., the parties must combine money, property, time, or skill in some common undertaking; (2) joint proprietorship and control, i.e., a proprietary interest and right of mutual control over the subject matter of the property engaged in the venture; (3) sharing of profits by express or implied agreement; and (4) a contract, express or implied, showing that a joint venture was entered into.

*Id.*

As a matter of law, API cannot satisfy the fourth prong on this record.   API's argument is that the Recapitalization agreements, together with Zurich's commitment to run Home's business in a fair and reasonable manner, amount to an implied contract

- 44 -

evidencing the joint venture. The Services Agreement governing REM's management of Home's business, however, expressly disclaimed creating a joint venture. (Docket No. 296-7, at 6 ("The companies and REM are not partners or joint venturers with each other, and nothing herein shall be construed as to make them such partners or joint venturers . . . REM shall perform its duties hereunder as an independent contractor.").) The Court cannot imply a contract that conflicts with the terms of an express contract. *Soderbeck v. Cent. for Diagnostic Imaging, Inc.*, 793 N.W.2d 437, 444 (Minn. Ct. App. 2010); *see also Schimmelfennig v. Gaedke*, 27 N.W.2d 416, 420 (Minn. 1947) ("where there is an express contract, there can be no contract implied in fact or quasi contractual liability with respect to the same subject matter"). Therefore, because API cannot satisfy the elements of joint venture as a matter of law, the Court will grant Zurich's motion on this theory.

### 4.    Successor Liability

Successor liability is appropriate where the transferor "sells or otherwise transfers all of its assets to another corporation," and either (1) the successor expressly or impliedly agreed to assume its debts, (2) the transaction amounts to a merger or consolidation, (3) the successor is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for the transferor's debts. *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn. 1989). In Minnesota, "[t]he transferee is liable for the debts, obligations, and liabilities of the transferor only to the extent provided in the contract . . . or to the extent provided by [Minnesota statutes]."

Minn. Stat. § 302A.661, subd. 4 (2002); *see also Johns v. Harborage I, Ltd.*, 664 N.W.2d

291, 297 (Minn. 2003); *J.F. Anderson Lumber Co. v. Myers*, 206 N.W.2d 365, 370

(Minn. 1973) (transferee not liable for transferor's debts absent agreement to assume

them, inadequate consideration, or fraudulent purpose).

API's argues that a fact question exists as to whether Zurich impliedly agreed to

assume Home's debts.  More specifically, API argues that the Harkin emails ("Home is

intrinsically part of the ZCI Group"; the Zurich group "has substantially taken over"

Home), together with Zurich's conduct in allegedly assuming control of Home's run-off

through REM are enough to get the case to the jury.  The Court finds, however, that no

reasonable jury could conclude on this record that Zurich impliedly agreed to assume all

of Home's liabilities.  A prodigious body of evidence shows that precisely the opposite is

true: participants in the Recapitalization transaction understood that Zurich was not

agreeing to an unlimited assumption of Home's liabilities.[20]  As Robert Solitro, the NHID

employee tasked with presenting recommendations to the Commissioner, observed, "It

was well understood that there was a limit of liability that Zurich could potentially be

exposed to." (Docket No. 306-12 (Solitro) (494: 21-23); *see also id.* at (430:15-431:2).)

---

[20] Docket No. 306-12 (Solitro) (87:14-88:23, 217:24-219:1, 316:12-317:12, 432:13-433:11, 494:10-23); Docket No. 306-14 (Nichols) (413:11-414:18, 519:14-23); Docket No. 307-11 (Faigin) (78:3-79:12, 92:11-93:4); Docket No. 307-13 (Kramer) (89:22-90:8); Docket No. 300-4 (hr'g tr.) (49:23-51:7); Docket No. 300-1 (Gluckstern) (54:23-59:24).

The Harkin emails do not change the analysis.  Assuming these documents to be relevant as, at a minimum, formal representations of a Zurich official,[21] the Court finds that in the face of the overwhelming weight of the evidence suggesting that Zurich did not agree to assume all of Home's debts, these isolated statements – made outside the Recapitalization context by an officer of a non-defendant – are insufficient soil in which to root the existence of an implied agreement to the contrary.  *Cf. Johns*, 664 N.W.2d at 297 (no successor liability where successor "carefully defined the liabilities it would assume, and [the debts at issue] were not among them").[22]  In sum, because the record will not support the conclusion that Zurich agreed, expressly or impliedly, to assume all of Home's liabilities as its successor, the Court will grant Zurich's motion as to the successor liability theory.

## CONCLUSION

The Court finds API's theories of vicarious and successor liability to be deficient as a matter of law on this record.  Because each of API's remaining causes of action are

---

[21] Zurich asserts that these representations are irrelevant because they paint an inaccurate picture of the Recapitalization by non-party Centre Re, motivated to obtain tax benefits under Irish law.  The Court will not completely disregard the Harkin email because it represents, at a minimum, statements of a Zurich-affiliated official.  The documents are plainly not dispositive, however, of the manner in which any "control" was actually exercised.

[22] The unreported case on which API principally relies is not contrary.  In *Gopher Oil Company*, the Minnesota Court of Appeals imposed successor liability after finding the existence of a *de facto* merger.  *State v. Gopher Oil Co. v. Bunker*, C1-95-738, 1995 WL 687688, at *3 (Minn. Ct. App. Nov. 21, 1995).  The successor corporation, however, "expressly agreed to assume [the transferor's] debts."  *Id.*  Whatever other resemblance the run-of-the-mill asset transfer in *Gopher Oil* bears to the complex Recapitalization, that fact is dispositive.

rooted in vicarious or successor liability theories, the Court will deny API's motion, and grant Zurich's motion for summary judgment as to all remaining claims.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Motion for Partial Summary Judgment [Docket No. 288] is **DENIED**.

2.      Defendants' Motion for Summary Judgment [Docket No. 285] is **GRANTED**.

3.      The parties must show cause on or before twenty (20) days from the date of this Order why the Court should not unseal the order, and specify any portion of the order warranting redaction.

DATED: March 30, 2012
at Minneapolis, Minnesota.

                                         JOHN R. TUNHEIM
                                         United States District Judge